GEORGE A. NYE AND MYRTLE E. NYE, ET AL.,[1] PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 5333–66—5335–66.   Filed May 2, 1968.

*Dermot R. Long*, for the petitioners.
*Roger Rhodes*, for the respondent.

FEATHERSTON, *Judge:* Respondent determined deficiencies in income taxes of the petitioners as follows:

| Petitioners | Year | Amount |
|---|---|---|
| George A. Nye and Myrtle Nye, docket No. 5333–66 | 1962 | $925.83 |
| | 1963 | 776.10 |
| | 1964 | 438.89 |
| Dale Thornton and Lucille M. Thornton, docket No. 5334–66 | 1962 | 1,016.80 |
| | 1963 | 870.87 |
| | 1964 | 605.92 |
| | *FYE—* | |
| Delta Sheet Metal & Air Conditioning, Inc., docket No. 5335–66 | 9/30/62 | 10,478.10 |
| | 9/30/63 | 9,510.65 |
| | 9/30/64 | 4,285.05 |

All issues presented for decision [2] arise from the creation of a corporation, Delta Sheet Metal & Air Conditioning, Inc. (sometimes referred to herein as corporation), and the transfer thereto of assets of a partnership composed of petitioners, Dale Thornton and George Nye. The issues to be decided are as follows:

(1) Whether the transaction whereby the partnership assets were transferred to the corporation falls within the provisions of Code

---

[1] The proceedings of the following petitioners are consolidated herewith: Dale Thornton and Lucille M. Thornton, docket No. 5334–66, and Delta Sheet Metal & Air Conditioning, Inc., docket No. 5335–66.

[2] Although the petition and brief filed on behalf of the corporation dispute an adjustment to its return for fiscal year ending Sept. 30, 1962, as to gain from the sale of an automobile, no evidence on this issue was presented at trial. The issue has been treated as abandoned. In any event, we would be compelled to find for respondent for lack of evidence. Rule 32, Tax Court Rules of Practice.

section 351.[3] Our resolution of this issue is also dispositive of the following subsidiary issues: (a) Whether payment on the principal of a note for $73,889.30 are taxable to Thornton and Nye as capital gain or as dividends; (b) whether interest payments on the note are deductible by the corporation and taxable as such to Thornton and Nye; and (c) whether the corporation takes the partnership's basis as its basis for the transferred assets.

(2) Whether the corporation is entitled to deductions for amortization of an alleged covenant not to compete executed in connection with the transaction.

### FINDINGS OF FACT

Some of the facts are stipulated and are found accordingly.

George A. Nye and Myrtle E. Nye[4] are husband and wife, and resided in Northridge, Calif., at the time their petition was filed. They filed joint Federal income tax returns on the cash basis of accounting for the periods in question with the district director of internal revenue at Los Angeles, Calif.

Dale Thornton and Lucille M. Thornton are husband and wife and resided in Sepulveda, Calif., at the time their petition was filed. They filed joint Federal income tax returns on the cash basis of accounting for the periods in question with the district director of internal revenue at Los Angeles, Calif.

Delta Sheet Metal & Air Conditioning, Inc., is a corporation formed under the laws of the State of California. On the date its petition was filed, the corporation's principal office and principal place of business was located in Van Nuys, Calif. The corporation filed its Federal income tax returns for the periods in question with the district director of internal revenue at Los Angeles, Calif.

On or about September 1, 1954, Thornton and Nye, as equal partners, formed a partnership, Delta Sheet Metal Co. (sometimes referred to herein as partnership) to engage in the business of operating a sheet-metal shop and doing sheet-metal contracting. In 1961, Thornton and Nye decided to expand their business. They consulted their attorney and, for various reasons including limiting their personal liability, decided to form a corporation through which their business would be conducted. The corporation was formed on October 10, 1961, to succeed the partnership in the operation of the sheet-metal business. It had authorized stock consisting of 2,000 shares of $100 par value common stock.

---

[3] All section references are to the Internal Revenue Code of 1954, as amended, unless otherwise indicated.

[4] The individual tax liabilities grow out of the activities of individual petitioners Dale Thornton and George A. Nye (sometimes referred to herein as Thornton and Nye) ; their spouses are parties only by virtue of joint returns. The term "petitioners" as used herein refers to the corporation, Delta Sheet Metal & Air Conditioning, Inc., and Thornton and Nye, unless otherwise indicated.

On October 31, 1961, a check in the amount of $4,000 was drawn on the partnership bank account and made payable to the corporation and the corporation later issued a total of 40 shares of its common stock to Thornton and Nye. No other stock was outstanding during the periods relevant to this proceeding. On October 31, 1961, another check in the amount of $10,000 representing a loan was drawn on the account of the partnership and made payable to the corporation.

The cash disbursements journal of the partnership contains the following entry dated October 31, 1961:

| | | |
|---|---|---|
| Investments—stock | $4,000 | |
| Cash | | $4,000 |
| Loan receivable | 10,000 | |
| Cash | | 10,000 |

To record the issuance of checks 6833 and 6834 to Delta Sheet Metal & Air Conditioning, Inc.

On November 1, 1961, all assets of the partnership, except cash in bank and accounts receivable, were transferred to the corporation pursuant to an "agreement" and "amendment to agreement" signed by Thornton and Nye as "Sellers" and, on behalf of the corporation, as "Buyer." The agreement transferred the physical assets of the partnership as well as intangibles, including goodwill, to the corporation. The recited consideration was $177,179.30, which consisted of $3,290 cash designated for inventory; a $73,889.30 promissory note designated for the transfer of the tangible and intangible assets of the partnership (other than inventory, cash, and accounts receivable); and a $100,000 promissory note designated for a covenant not to compete. The agreements allocated the consideration as follows:

| | |
|---|---|
| 1. Inventory | $3,290.00 |
| 2. Heavy equipment, excluding trucks | 60,000.00 |
| 3. Leasehold improvements | 2,274.00 |
| 4. Trucks and vehicles | 7,000.00 |
| 5. Office equipment, customer lists and contracts, and other tangible property | 4,614.60 |
| 6. Restrictive covenant to be executed by sellers | 100,000.00 |

The allocations to items 1, 2, 3, 4, and 5 reflected the approximate fair market values of the properties transferred. The remaining cost basis of items 2, 3, 4, and 5 (excluding customer lists and contracts) in the hands of the partnership was $29,542.89. The value of the business as a going concern and of its goodwill was substantial, but no part of the recited consideration was allocated to them.

On November 1, 1961, the corporation executed an unsecured promissory note payable to Thornton and Nye in the amount of $73,889.30, with interest of 6 percent per annum. The note was payable in annual installments of $7,388.93, or more, plus interest, the first payment to become due "on or before" December 31, 1962. The corporation executed another document dated November 1, 1961, entitled "Promis-

sory Note," calling for the corporation to pay $100,000, without interest, in annual installments of $10,000 or more, the first payment to become due December 31, 1962.

The $73,889.30 promissory note was not subordinated to claims of stockholders or other creditors, and payments of principal and interest were made annually when due. Payments of principal on the $100,000 promissory note were also made annually when due.

On November 1, 1961, Thornton and Nye also executed a supplemental agreement with the corporation entitled "Restrictive Covenant." In this agreement, Thornton and Nye covenanted that they would not "establish, re-establish, re-open, become engaged in, or in any other manner become interested in, directly or indirectly, financially or otherwise, or assist any person, firm or corporation, nor attempt to solicit customers for, or advise any firm or in any way alienate, directly or indirectly, any of the customer accounts of said business, nor disclose to any other person, firm or corporation, the trade secrets, customer lists, modus operandi or bidding procedure of said business, or engage in any similar type of business" within four designated counties. The recited consideration was $100,000, payable in 10 annual installments. Paragraph III of the agreement provided as follows:

In the event of breach of this covenant by the Sellers all monies paid to the date of breach shall remain the property of the Sellers and Buyer shall have no further obligation to pay the remaining balance thereof.

Thornton and Nye had operated the partnership business without a covenant not to compete.

On November 1, 1961, the first meeting of the corporation's incorporators and directors was held. Dale Thornton was elected president, and George A. Nye, vice president. They served in these capacities during the years 1962, 1963, and 1964.

On November 27, 1961, 40 shares of stock of the corporation were issued at par value in the following names: Dale Thornton, 20 shares; George A. Nye, 20 shares. Permission to issue these shares had been obtained from the State of California on November 24, 1961.

Account number 408, "Loans from stockholders and officers," on the books of the corporation, contains the following entries, reflecting certain loans made by Thornton and Nye to the corporation:

| | Posting reference | Dr. | Cr. | Balance |
|---|---|---|---|---|
| 10/12/61 | CR 1 | | 1,000 | |
| 10/31/61 | CR 1 | | 10,000 | |
| 11/15/61 | CR 3 | | 15,000 | 26,000 |
| 9/10/62 | CD 30 | 26,000 | | |
| 12/11/62 | CR 25 | | 20,000 | |
| 9/30/63 | CR 44 | | 15,000 | |
| 12/12/63 | CR 51 | | 25,000 | 60,000 |
| 5/12/65 | CD 126 | 20,000 | | 40,000 |

The loans made in 1961 were non-interest-bearing and unsecured. The loans made in 1962 and 1963 were unsecured and bore interest at the rate of 6 percent per annum.

The business continued to prosper following its transfer to the corporation. The partnership return for 1961 discloses sales of $471,918.72 and net income of $84,941.26.[5] The corporate tax returns for the fiscal years ending September 30, 1962, 1963, and 1964, show net sales of $501,832.58, $574,839.58, and $503,264.65, respectively. The corporate tax return for the fiscal year ending September 30, 1962, the first taxable year of the corporation, shows taxable income of $66,615.83. This figure is unadjusted for interest, depreciation, and amortization of the restrictive covenant which are in dispute as well as for officers' salaries. Adjusting the reported taxable income for these items, the net income of the corporation for the fiscal period ended September 30, 1962, computed in the same manner as that of the partnership for the prior period, was $132,943.72.[6]

### ULTIMATE FINDINGS OF FACT

The transaction whereby the partnership assets were transferred to the corporation was not a bona fide sale of assets to the corporation by Thornton and Nye or by the partnership. Rather it was part of a larger transaction whereby the individual partners transferred cash and assets to the corporation in exchange for stock and a promissory note in the amount of $73,889.30. The promissory note in the amount of $73,889.30 was a security within the meaning of section 351 and constituted bona fide indebtedness of the corporation.

The purported covenant not to compete, entitled "Restrictive Covenant," and the promissory note in the amount of $100,000, lacked economic substance and reality. The note did not constitute bona fide indebtedness of the corporation.

### OPINION

On October 10, 1961, Dale Thornton and George Nye, partners in an air-conditioning contracting business, organized a corporation,

---

[5] The partnership used the calendar year for reporting income for tax purposes. The transfer of assets from the partnership to the corporation occurred on Nov. 1, 1961. The partnership did not file its return for 1961 on the basis of a "short" taxable year but continued in existence for the purpose of collecting accounts receivable which were retained and also to collect payments on the notes executed by the corporation. The sales figure in the 1961 partnership return reflected sales only through Oct. 31, 1961.

[6] The items for which adjustments are made consist of (1) interest on the $73,889.30 promissory note ($4,063.91), (2) depreciation in excess of that which would have been allowable by using the partnership's basis in the transferred assets ($5,983.98), (3) amortization of the alleged covenant not to compete ($10,000), and (4) officers' salaries for Thornton and Nye ($46,280). The corporate tax returns for fiscal years ending Sept. 30, 1963 and 1964, with similar adjustments would also show increases, although the profit was not as great in those years. We have used fiscal 1962, for comparison purposes, because we believe it more accurately reflects what the parties could have reasonably anticipated at the time of incorporation.

Delta Sheet Metal & Air Conditioning, Inc., to take over their partnership business. Thereafter, on October 31, 1961, Thornton and Nye caused the partnership to transfer $4,000 in cash to the corporation and the corporation subsequently issued to Thornton and Nye 40 shares of $100 par value common stock. The next day, November 1, 1961, Thornton and Nye executed an agreement and an amendment thereto whereby they transferred and purportedly sold the assets of the partnership (excluding cash and accounts receivable) to the corporation for $3,290 cash, stated to have been paid for inventory, and a 10-year, interest-bearing installment promissory note of $73,889.30, stated to have been given for the remaining tangible and intangible assets of the partnership.

Respondent contends that the transfer of cash and partnership assets were both contributions of capital to the corporation under section 351 and the $73,889.30 note was evidence of an equity interest in the corporation in the nature of stock with the following tax results: (1) The payments of the principal of the note were dividend income to Thornton and Nye, as were the interest payments; (2) the corporation was not entitled to deductions for the interest payments; and (3) the corporation, under Code section 362, took the partnership's basis as its basis for the transferred assets.

Petitioners contend that Thornton and Nye created the corporation with a cash capital contribution of $4,000 and then in a separate transaction sold the partnership assets to the corporation. They contend that the $73,889.30 note was not "stock" but evidence of bona fide indebtedness of the corporation and that the transaction produced the following tax results: (1) The payments of the principal of the note, to the extent they exceed basis, were taxable to Thornton and Nye as capital gain; (2) the interest payments on the note were taxable to Thornton and Nye as interest and were deductible as such by the corporation; and (3) the corporation took as its basis for the transferred assets the purchase price of $73,889.30 as allocated among the transferred assets in the November 1, 1961, agreement.

All the tax adjustments in dispute depend upon whether section 351 should be applied and, if so, how it should be applied. Recognizing that each case presenting this recurring set of problems turns on its own facts, we have concluded that the partnership's transfers of cash and business assets fall within section 351, as contended by respondent. However, petitioners correctly contend that the $73,889.30 note was not stock but evidence of indebtedness and, under the decided cases, the note was, in our opinion, a "security" within the meaning of the section.[7]

---

[7] While respondent on brief has taken the broader position that the $73,889.30 note was evidence of equity interests, rather than indebtedness, our conclusion that the note was a security within sec. 351 is comfortably within the language of the notices of deficiencies.

As part of the November 1, 1961, agreement, Thornton and Nye also agreed to enter into a covenant not to compete with the corporation in its business for a period of 10 years. Purportedly in consideration of a separate agreement so providing, the corporation gave them a non-interest-bearing, 10-year promissory note for $100,000, payable in 10 equal annual installments. This part of the agreement raises a separate set of legal problems and, in our view, respondent correctly determined that the purported covenant lacked economic reality and did not support the annual $10,000 amortization deductions claimed by the corporation.

### Issue 1. Applicability of Section 351

Section 351 provides that no "gain or loss shall be recognized if property is transferred to a corporation * * * by one or more persons solely in exchange for stock or securities in such corporation" and immediately after the exchange such person or persons are in "control" of the corporation.[8] Provisions similar to section 351 have been in the tax law since 1921. H. Rept. No. 350, 67th Cong., 1st Sess. p. 10 (1921); S. Rept. No. 275, 67th Cong., 1st Sess., p. 11 (1921). Their purpose is to permit business readjustments without immediate tax consequences. *Helvering* v. *Cement Investors*, 316 U.S. 527, 533 (1942). In some cases they work to the advantage of the taxpayer and in others to his disadvantage. They are not optional, however, and apply regardless of the intent of the transferors. *Houck* v. *Hinds*, 215 F. 2d 673 (C.A. 10, 1954); *Miller Bros. Electric, Inc.*, 49 T.C. 446 (1968); *Gus Russell, Inc.*, 36 T.C. 965 (1961); *Pocatello Coca-Cola Bottling Co.* v. *United States*, 139 F. Supp. 912, 915 (E.D. Idaho 1956).

Here, in a transaction carried out pursuant to a preconceived plan, cash and business assets were transferred to the corporation by Thornton and Nye. Property includes money, so the fact that cash as well as business assets was transferred does not prevent the applicability of the section. *Halliburton* v. *Commissioner*, 78 F. 2d 265 (C.A. 9, 1935); *George M. Holstein, III*, 23 T.C. 923 (1955). In exchange for such property, Thornton and Nye admittedly received

---

[8] SEC. 351. TRANSFER TO CORPORATION CONTROLLED BY TRANSFEROR.

(a) GENERAL RULE.—No gain or loss shall be recognized if property is transferred to a corporation * * * by one or more persons solely in exchange for stock or securities in such corporation and immediately after the exchange such person or persons are in control (as defined in section 368(c)) of the corporation. * * *

(b) RECEIPT OF PROPERTY.—If subsection (a) would apply to an exchange but for the fact that there is received, in addition to the stock or securities permitted to be received under subsection (a), other property or money, then—

(1) gain (if any) to such recipient shall be recognized, but not in excess of—

(A) the amount of money received, plus

(B) the fair market value of such other property received; and

(2) no loss to such recipient shall be recognized.

stock and a note which, we conclude, was a security of the corporation. Immediately after the transfer Thornton and Nye were in control of the corporation. The transaction, therefore, falls squarely within section 351. *Houck* v. *Hinds, supra; Baker Commodities, Inc.*, 48 T.C. 374 (1967), on appeal (C.A. 9, Mar. 28, 1968); *R. M. Gunn*, 25 T.C. 424 (1955), affirmed per curiam 244 F. 2d 408 (C.A. 10, 1957), certiorari denied 355 U.S. 830 (1957).

To escape the applicability of section 351, petitioners contend that: (a) Thornton and Nye were not in "control" of the corporation immediately after the transaction in which the partnership assets were transferred to the corporation; (b) the transaction in which the transfer occurred was a sale, not an "exchange"; and, closely related to the second contention, (c) the $73,889.30 note was not "stock or securities" within the section.

(a) *Control.*—Section 368(c) defines "control" as used in section 351 to mean "the ownership of stock possessing at least 80 percent of the total combined voting power of all classes of stock entitled to vote and at least 80 percent of the total number of shares of all other classes of stock of the corporation." Pointing to this definition, petitioners contend that Thornton and Nye, equal partners, transferred partnership assets, which they held as tenants in partnership, to the corporation and, under California law, their wives obtained a community interest in the stock issued by the corporation, with the result that Thornton and Nye did not have the requisite 80-percent control of the corporation.

The general rule of California law is that property acquired with community funds is community property and Thornton and Nye concede that they created the partnership with community funds. However, a "partner is co-owner with his partners of specific partnership property holding as a tenant in partnership" and a "partner's right in specific partnership property * * * is not community property." Cal. Corp. Code sec. 15025(1) and sec. 15025(2)(e) (West 1955). The community property exception in section 15025(2)(e) as to specific partnership assets does not apply, however, to corporate stock acquired with community funds. Such stock is community property, and a wife has an interest "present, existing and equal" to that of her husband. See Cal. Civ. Code sec. 161a (West 1954). Petitioners rely upon these statutes to show that Thornton and Nye, the sole transferors of the partnership assets, but owners of only a community interest in the corporate stock, lacked the requisite 80-percent control of the corporation.

In *Miller Bros. Electric, Inc., supra*, we considered and rejected a similar argument. Relying upon decisions of the California courts we

held that there occurred either (1) a conversion of the partnership property to individual property immediately prior to the transfer to the corporation, or (2) actual or constructive receipt by the partnership of the stock prior to its distribution to the individuals. In either case the control requirements of section 351 were met. We adhere to those views.

(b) *Sale* or *Exchange.*—Petitioners next contend that Thornton and Nye created the corporation and purchased its stock for $4,000 cash and, as a separate transaction, later sold the partnership assets to the corporation in consideration of the $73,889.30 interest-bearing note, payable in 10 annual installments. Indeed, with the assistance of counsel they meticulously cast the transaction in the form of a sale. They emphasize that the sale price was based on the fair market value of the assets as determined through an independent appraisal and argue that they transferred no partnership assets to the corporation in exchange for stock.

Whether a transfer of property to a corporation, for purposes of Federal taxation, is a sale as distinguished from an exchange within section 351, requires consideration of all the facts. No rule of thumb applies; no single criterion determines the result; each case must be adjudicated upon its own facts. *Gooding Amusement Co.* v. *Commissioner*, 236 F. 2d 159, 165 (C.A. 6, 1956), affirming 23 T.C. 408 (1954), certiorari denied 352 U.S. 1031 (1957). The burden of proving that the transfer was a sale rests with petitioners.

We are not convinced that the evidence here shows a sale. The language used in the transfer documents is, of course, to be considered, but standing alone it is not sufficient to require a portion of the transaction to be treated as a sale; substance, not form, governs. *Commissioner* v. *Court Holding Co.*, 324 U.S. 331 (1945).

In our view, petitioners have provided no factual basis for their contention that the purported sale of business assets was a transaction separate from the $4,000 cash transfer. On the contrary, the evidence shows clearly that the transfers of cash and business assets and the receipt of stock and the note were inseparably related. The corporation was formed by Thornton and Nye on October 10, 1961, following conferences with their attorney. On October 31, 1961, the partnership issued a check in the amount of $4,000 in payment for 40 shares to be isssued to Thornton and Nye. The next day the parties entered into an agreement transferring the partnership's assets to the corporation for cash and notes. The testimony is unmistakably clear that these steps were part of a preconceived plan developed by petitioners' attorney to change the organization of the business from partnership to corporate form. The fact that the cash was purportedly paid for stock one

day and the assets transferred for the note the next confirms the oral testimony that the whole transaction was the consumation of a single plan.

Thornton and Nye testified that their reason for incorporating the business was to limit their liabilities for possible losses from a projected expansion of their operations. However, they gave no reason why the transaction was divided into two parts, the transfer of cash for stock and the purported sale of the business assets for the note. Such evidence might have confirmed that the form in which the transaction was cast was consistent with its true nature. Cf. *Miller's Estate v. Commissioner*, 239 F. 2d 729, 734 (C.A. 9, 1956); *H. B. Zachary Co.*, 49 T.C. 73 (1967), on appeal (C.A. 5, Apr. 1, 1968). Lack of such evidence is worthy of note because it fails to negate the inference to be drawn from other facts indicating that the two parts of the transaction were inseparably related. *Truck Terminals, Inc. v. Commissioner*, 314 F. 2d 449 (C.A. 9, 1963), affirming 33 T.C. 876 (1960). In the absence of evidence of a business reason for dividing the transaction, we conclude that a separate sale has not been shown.

(c) *Promissory Note as a Security under Sec. 351.*—Our conclusion that the transaction was not a sale but an exchange within section 351 makes it necessary to determine whether the $73,889.30 promissory note was "stock" or a "security" within the meaning of section 351(a) or "other property" within the meaning of section 351(b). See *Peter Raich*, 46 T.C. 604 (1966). We have concluded that the note constituted a "security."

The law is now well settled that promissory notes may qualify as securities within the purview of section 351. *Parkland Place Co. v. United States*, 354 F. 2d 916 (C.A. 5, 1966); *Campbell v. Carter Foundation Production Co.*, 322 F. 2d 827 (C.A. 5, 1963); *Burnham v. Commissioner*, 86 F. 2d 776 (C.A. 7, 1936), affirming 33 B.T.A. 147 (1935), certiorari denied 300 U.S. 683 (1936); *Baker Commodities, Inc., supra; Camp Wolters Enterprises, Inc.*, 22 T.C. 737 (1954), affd. 230 F. 2d 555 (C.A. 5, 1956); *Alderson v. Healy*, an unreported case (D.Mont. 1963, 12 A.F.T.R. 2d 5856, 63–2 U.S.T.C. par. 9765). Basic to this settled rule, however, is a requirement that the notes have a sufficiently long term to accord them an investment quality rather than the characteristics of cash.[9] The latter characteristics may disqualify short-term notes as securities. See *Pinellas Ice Co. v. Com-*

---

[9] Commentators view the term of a note as the single and most important quality and agree that notes with a maturity of 10 years or longer may be safely termed securities. Bittker and Eustice, Federal Income Taxation of Corporations and Shareholders, sec. 3.03 (2d ed. 1966), states: "Notes with a five year term or less seem to be unable to qualify as 'securities,' while a term of ten years or more is apparently sufficient to bring them within the statute." See also Kaufman, "Securities Within the Tax-Free Reorganization and Exchange Provisions," 8th Ann. N.Y.U. Tax Inst. 117, 120 (1956).

*missioner*, 287 U.S. 462 (1933); *Commissioner* v. *Sisto F. Corp.*, 139 F. 2d 253 (C.A. 2, 1943). The settled rule recognizes that section 351 refers to both "stock" and "securities." The section incorporates the definition of "control" contained in section 368(c) which relates only to stock and thus indicates that the control of the corporation need not be exercised through the securities.

In *Camp Wolters Enterprises, Inc.*, *supra* at 751, this Court adopted the following guide for determining whether debt instruments qualify as "securities" as that term is used in the predecessor of section 351, section 112(b)(5) of the 1939 Code:

> The test as to whether notes are securities is not a mechanical determination of the time period of the note. Though time is an important factor, the controlling consideration is an overall evaluation of the nature of the debt, degree of participation and continuing interest in the business, the extent of proprietary interest compared with the similarity of the note to a cash payment, the purpose of the advances, etc. It is not necessary for the debt obligation to be the equivalent of stock since section 112(b)(5) specifically includes both "stock" and "securities."

An "overall evaluation" of the $73,889.30 note given to Thornton and Nye shows that it was a security within section 351. The note contained an unconditional promise to pay the holder $73,889.30 in 10 equal annual installments plus interest at the rate of 6 percent per annum. The holder of the note had the right to declare the entire balance due upon default by the maker in payments of principal or interest. If the holder was required to institute a suit to collect, he was entitled to recover attorney's fees.

The note did not evidence an isolated transaction of purchase and sale having its inception after the formation and launching of the corporation but, as we have indicated, was "an integral part of the scheme of its forming and financing"; the note and the stock ownership by Thornton and Nye "were together different forms of the assured participation in the potluck of the enterprise," for a 10-year period. *Camp Wolters Enterprises, Inc.* v. *Commissioner*, 230 F. 2d 555, 559, 560 (C.A. 5, 1956). The properties for which the note was issued constituted a permanent contribution to the corporation, indeed virtually its sole operational assets; such properties did not represent short-term advances to be used by the corporation for temporary or current corporate needs. Cf. *Neville Coke & Chemical Co.* v. *Commissioner*, 148 F. 2d 599 (C.A. 3, 1945), certiorari denied 326 U.S. 726; *Wellington Fund, Inc.*, 4 T.C. 185 (1944). In no sense was the note the equivalent of cash. *Pinellas Ice Co.* v. *Commissioner*, *supra*. Along with their stock, the note gave Thornton and Nye, the sole stockholders, a continuing investment in the enterprise. At the time the note was issued the corporation did not have sufficient liquid assets to retire it;

it could have been paid only through sale of the business as a going concern. As a practical matter payment was intended to be derived from earnings. As sole stockholders and as officers Thornton and Nye had all the control necessary to assure protection of their long-term investment and payment of the note.

In sum, the 10-year $73,889.30 note was no less a security than, for example, the debt obligations which were held to fall within that category in *Helvering* v. *Watts*, 296 U.S. 387 (1935) (1- to 7-year bonds) ; *Parkland Place Co.* v. *United States, supra* (10-year promissory note) ; *Campbell* v. *Carter Foundation Production Co., supra* (5-year promissory note) ; *Burnham* v. *Commissioner, supra* (10-year promissory note) ; and *Camp Wolters Enterprises, Inc.* v. *Commissioner, supra* (5- to 9-year promissory notes).

Implicit in our conclusion that the 10-year $73,889.30 promissory note was indebtedness in the form of a security within section 351 is the rejection of respondent's broader contention that the note was in reality evidence of an equity interest, in the nature of stock. Some of the points made by respondent in support of his stock argument also support our conclusion that the note was a security. However, other factors must be considered.

As noted above, the note was in the form of a debt obligation. Its terms in no way resembled stock. Form is, of course, not determinative, but is a factor to be considered. *Baker Commodities, Inc., supra; Charles E. Curry*, 43 T.C. 667 (1965).

Respondent relies primarily on four factors to show that the promissory note did not in fact constitute debt. He contends that the corporation was undercapitalized; that Thornton and Nye placed the partnership's assets at the risk of the business; that the notes were owned in the same proportion as the stock, and that the value placed on the assets was overstated.

In attacking the adequacy of the capital structure of the corporation, respondent adds to the promissory note of $73,889.30, the loans made by Thornton and Nye to the corporation of $1,000 on October 12, 1961; $10,000 on October 31, 1961, and $15,000 on November 15, 1961, and compares this total indebtedness of $99,889.30 with the $4,000 cash capital contribution in arriving at a debt-equity ratio of 25 to 1.

As we pointed out in *Burr Oaks Corp.*, 43 T.C. 635 (1965), affd. 365 F. 2d 24 (C.A. 7, 1966), the transfer of property to a thinly capitalized corporation raises an inference that the transfer is a capital contribution. However, thin capitalization is only one of the factors from which the presence or absence of a bona fide debtor-creditor relationship may be determined, and the existence of that factor alone

will not transform a valid indebtedness into equity capital. *Gooding Amusement Co., supra; Baker Commodities, Inc., supra.* The thin-capitalization argument must be viewed in the light of the further principle that stockholders in creating a corporation have discretion in deciding how much of their funds or assets they care to risk in the form of capital and how much they are willing to lend as credit. *Byerlite Corp. v. Williams,* 286 F. 2d 285 (C.A. 6, 1961); *Sun Properties, Inc. v. United States,* 220 F. 2d 171 (C.A. 5, 1955); *Rowan v. United States,* 219 F. 2d 51 (C.A. 5, 1955). The problem is to ascertain the substance of what was done.

Here the partnership had operated successfully since its inception in 1954. The partnership return for the year 1961 shows sales of $471,918.72, and net income to each partner of $42,470.63, a total of $84,941.26, a sum larger than the amount of the note. The corporate returns show net sales of $501,832.58, $574,839.58, and $503,264.65, for the fiscal years ended September 30, 1962, 1963, and 1964, respectively. Looking at the net income of the partnership in 1961 of $84,941.26 and the net income of the corporation computed in like manner for its first taxable year of $132,943.72,[10] it is clear that reasonably anticipated current earnings were sufficient to permit retirement of the $73,889.30 note. In addition, the corporation made all payments of principal and interest on the $73,889.30 promissory note when due. These facts rebut the inference raised by the high ratio of debt to capital that the note was not true indebtedness. *Baker Commodities, Inc., supra; Sun Properties, Inc. v. United States, supra.*

Moreover, we perceive no reason why either the going-concern value or the goodwill of the established business should not be taken into account in testing the adequacy of the corporation's capitalization. While no evidence was offered to establish precisely the going-concern value of the business, the high level of income both before and after the transfer demonstrates substantial value. *Murphy Logging Co. v. United States,* 378 F. 2d 222 (C.A. 9, 1967); *Ainslie Perrault,* 25 T.C. 439, 450–451 (1955), affirmed per curiam 244 F. 2d 408 (C.A. 10, 1957); *Conestoga Transportation Co.,* 17 T.C. 506 (1951). Such going-concern value is not to be treated as merely incidental to the depreciable assets; it is, in itself, a nondepreciable intangible asset. *United States v. Cornish,* 348 F. 2d 175 (C.A. 9, 1965). Respondent's mathematical computation of a debt-to-capital ratio ignores these factors. We believe that both the goodwill and going-concern value, which were placed at the risk of the business as capital contributions, were substantial.

---

[10] See fn. 6, *supra.*

To support the thin-capitalization argument, respondent also contends that excessive values were assigned by petitioners to the following assets transferred in exchange for the $73,889.30 promissory note:

| | Petitioner's values | Respondent's values |
|---|---|---|
| Pacific hydraulic press brake | $11,000 | $4,000 |
| Wysong shear | 8,700 | 6,650 |
| Whitney hand brake | 700 | 575 |
| Chicago hand brake | 1,150 | 125 |
| Peddinghams iron works | 8,900 | 3,750 |
| Total | 30,450 | 15,100 |

Respondent does not challenge the reasonableness of the values assigned to other transferred assets totaling $43,439.30.

The testimony of Thornton and Nye was undisputed that they employed an independent appraiser to give them an opinion as to the values of the transferred assets and that such values were used in computing the contract prices. Later, when a revenue agent questioned the values used, petitioners employed another appraiser, Gerald P. Cashion, whose competence was admitted by respondent. Cashion personally inspected the disputed items in March 1965, and testified that the values assigned by petitioners were the approximate values of the assets.

While it is true that Cashion estimated the values as of March 1965, nothing in the record suggests that the equipment was more valuable after 3½ years of use than in October 1961. Respondent offered no testimony in support of a lower valuation; instead, respondent relied on book values—notoriously poor guides to fair market value. *Kraft Foods Co.* v. *Commissioner*, 232 F. 2d 118 (C.A. 2, 1956); *Dumont-Airplane & Marine Instruments, Inc.*, 28 T.C. 1308 (1957); *Sheldon Tauber*, 24 T.C. 179 (1955). We find that the values assigned in the agreements of November 1, 1961, were the approximate fair market values of the various assets on that date. In any event, the goodwill and going-concern value, in the light of the business history of the enterprise, were sufficient to establish that it was adequately capitalized even if the values of some of the machinery items were overstated.

Respondent next argues that the assets were placed at the risk of the business and that the ownership of the stock and note was proportionate. We agree that Thornton and Nye assumed some risk in transferring the partnership assets to the corporation; any long-term investment in the form of a security involves some risk. Cf. *Camp Wolters Enterprises, Inc.* v. *Commissioner, supra.* But the $73,889.30 promissory note was in no way subordinated to the claims of general creditors or to the claims of shareholders. Payments on the note were

made when due and there is no evidence that the parties ever intended otherwise. Petitioners no doubt expected the note to be paid from earnings, but the payment of indebtedness usually depends to a large extent upon the success of the obligor. *American Processing & Sales Co.* v. *United States*, 371 F. 2d 842, 856–857 (Ct. Cl. 1967); cf. *Richard Drachman*, 23 T.C. 558, 562 (1958).

While it is true that the stock ownership was in the same proportion as the note, this factor is not conclusive. *Campbell* v. *Carter Foundation Production Co.*, *supra*. It is well settled that an individual can occupy the dual relationship of stockholder and creditor whether such stockholder-creditor owns all or a mere fraction of the debtor-corporation's stock. *Farley Realty Corp.* v. *Commissioner*, 279 F. 2d 701 (C.A. 2, 1960), affirming a Memorandum Opinion of this Court. The fact that Thornton and Nye each owned 50 percent of the corporation's stock and 50 percent of the note in question is not unusual since they each owned 50 percent of the assets transferred to the corporation.

Thus we find no substantial basis on which this Court could declare that the $73,889.30 note was not what it purported to be, i.e., indebtedness. This is what the petitioners intended it to be and they treated it as such. By its unambiguous terms the note created indebtedness. It was subordinated to no other claims. The business history of the enterprise demonstrates that the corporation had a capacity to pay indebtedness of this amount; indeed, the face of the note was in an amount less than the prior year's net earnings of the partnership. The facts are that the high level of earnings continued and the annual installments were paid when due. Taking into account the goodwill and going-concern values of the business we think it is clear that the corporation was adequately capitalized from the beginning. The note represented a long-term investment of valuable assets and was given as an integral part of the formation, launching, and financing of the corporation. We see no substantial basis for a conclusion that the note did not represent indebtedness.

In summary, the following tax results flow from our conclusions that the transaction falls within section 351 [11] and the $73,889.30 note was a security: (1) Since the note was a capital asset in the hands of Thornton and Nye, payments of the principal thereof to the extent they exceed basis are taxable as long-term capital gain under section 1232(a)(1) which provides that amounts received in retirement of "bonds, debentures, notes, or certificates" shall be "considered as amounts received in exchange therefor," *Baker Commodities, Inc.*,

---

[11] Viewed as a single transaction involving the transfer of cash and partnership assets for stock and the $73,889.30 note, the transaction falls within sec. 351(a) rather than sec. 351(b).

*supra* at 407–408; (2) interest payments on the note are deductible by the corporation and taxable (as such) to Thornton and Nye; and (3), since section 362(a) provides that, if property is acquired by a corporation in a transaction to which section 351 applies, "the basis shall be the same as it would be in the hands of the transferor," the corporation here takes the partnership's basis for the purpose of computing depreciation of the transferred assets; the step-up in basis claimed by petitioners is denied.

### Issue 2. Covenant Not to Compete

Unlike the asset transfer the purported covenant not to compete does not stand up to close scrutiny. The covenant was the subject of a separate agreement and a separate, non-interest-bearing note. Although its general provisions were in standard form, forbidding Thornton and Nye to enter into a competing business, alienate customers, or disclose trade secrets, customer lists, modus operandi, or bidding procedures, it limited the corporation's remedy in the event of breach to extinguishment of the obligation to continue payments. All payments made to the date of breach were to remain the property of the sellers.

The rights acquired by the corporation were as empty as the sanction specifically granted to enforce these rights. The corporation received little of substance it did not have already by virtue of the fact that the covenantors were officers of the corporation and by virtue of the express transfer of the partnership's goodwill to the corporation. Corporate officers and directors are not permitted to use their position of trust and confidence to further their private interests. While technically not trustees, they stand in a fiduciary relationship to the corporation and its stockholders. The most scrupulous observance of duty is required of a corporate officer, "not only affirmatively to protect the interests of the corporation committed to his charge, but also to refrain from doing anything that would work injury to the corporation, or to deprive it of profit or advantage which his skill and ability might properly bring to it, or to enable it to make in the reasonable and lawful exercise of its powers." *Guth* v. *Loft, Inc.*, 23 Del. Ch. 255, 5 A. 2d 503, 510 (1939), quoted in *Bancroft-Whitney Co.* v. *Glen*, 64 Cal. 2d 327, 411 P. 2d 921, 934–35, 49 Cal. Rptr. 825, 838–39 (1966). This includes aiding a competing business, alienation of customers, and disclosure of trade secrets and customer lists. *Bancroft-Whitney Co.* v. *Glen*, *supra*.

Where goodwill is transferred to the buyer of a business there is an implied obligation of good faith and fair dealing that the seller will not do anything to injure the right of the buyer to receive the benefits of the agreement. *Karsh* v. *Haiden*, 120 Cal. App. 2d 75, 260

P. 2d 633 (Dist. Ct. App. 1953). Such a provision carries with it the patronage which has become an asset of the business; "one who has sold his interest in the goodwill of a business can no more act directly to destroy that asset than he could destroy or make useless any other asset which he had for value transferred to the purchaser." *Bergum* v. *Weber*, 136 Cal. App. 2d 389, 288 P. 2d 623, 625 (Dist. Ct. App. 1955). Thus, most of the provisions of the covenant purportedly protecting the corporation from harm by Thornton and Nye largely duplicated the restrictions implied in the basic agreements.

These rights flowing to the corporation by virtue of the status of Thornton and Nye as officers and the transfer of the partnership's goodwill may not have much significance as long as Thornton and Nye are also the sole stockholders, but neither does the covenant not to compete. It merely relates to technical rights which the corporation already has in any event.

Not every covenant not to compete will support amortization deductions. To provide a basis for such deductions the "covenant must have some independent basis in fact or some arguable relationship with business reality such that reasonable men, genuinely concerned with their economic future, might bargain for such an agreement." *Schulz* v. *Commissioner*, 294 F. 2d 52, 55 (C.A. 9, 1961), affirming 34 T.C. 235 (1960); *Levine* v. *Commissioner*, 324 F. 2d 298, 302 (C.A. 3, 1963), affirming a Memorandum Opinion of this Court. "Courts need not honor a vendor's covenant which has no basis in economic reality." *Balthrope* v. *Commissioner*, 356 F. 2d 28, 31 (C.A. 6, 1966), affirming a Memorandum Opinion of this Court.

Considering all the evidence, including the fact that Thornton and Nye were the sole stockholders and were the principal officers of the corporation, that they had conducted the business as partners from 1954 to 1961 without such a covenant, that substantially the same rights were conferred on the corporation by the express transfer of goodwill, and that the enforcement remedies were hollow, we conclude that the covenant not to compete lacked economic reality. It was not the kind of agreement that businessmen dealing at arm's length would have executed.

Petitioners seek to justify the covenant on the theory that the annual payments were designed to help keep one of the former partners, Thornton or Nye, from leaving the corporation to enter a competing business. But payments by the corporation under the covenant were necessarily to be made from earnings and profits. Since Thornton and Nye were the sole stockholders of the corporation, they could have declared dividends equal not only to the $10,000 annual covenant payments but to all the earnings and profits available for distribution.

If the right to receive all the earnings through dividend distributions would not keep them from leaving the corporation, there is no reason to think that payments of only part of the earnings under the covenant would achieve that purpose.

We conclude that the covenant lacked economic substance and reality and was merely a device to obtain deductions for the corporation for annual distributions in the nature of dividends. The corporation is therefore not entitled to deductions for the amortization of the covenant.

To reflect our disposition of the issues in these cases,

*Decisions will be entered under Rule 50.*