GEORGE A. LAGERQUIST and MARGARET E. LAGEROUIST, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Lagerquist v. Commissioner
Docket No. 1953-85.
United States Tax Court
T.C. Memo 1987-185; 1987 Tax Ct. Memo LEXIS 181; 53 T.C.M. (CCH) 530; T.C.M. (RIA) 87185; April 7, 1987. E. M. Murray and Matthew W. Stanley, for the petitioners. Michael R. McMahon, for the respondent. COHEN
MEMORANDUM FINDINGS OF FACT AND OPINION COHEN, Judge: Respondent determined the following deficiencies in petitioners' Federal income taxes: Year
Deficiency
1977
$1,531
1978
597,269
1979
18,200
After concessions, the issues for decision are (1) whether certain notes issued to petitioner in a section *182 351 [1] transaction were "securities" or "other property" and, if the notes were "other property," (2) the fair market value of the notes on the date of the section 351 transaction. FINDINGS OF FACT Some of the facts have been stipulated, and the facts set forth in the stipulation are incorporated in our findings by this reference. Petitioner George A. Lagerquist (petitioner) and Margaret E. Lagerquist resided in Tacoma, Washington, when their petition was filed. Petitioners filed joint Federal income tax returns for the years in issue with the Internal Revenue Service Center in Ogden, Utah. As of the trial of this case, petitioner had been active in the wood products industry for over 50 years. In August 1978, petitioner held majority interests in five wood products firms ("the Galco companies"). Galco Wood Products operated a lumber yard in Tacoma, Washington; each of the other Galco companies sold building materials in Alaska. Petitioner was chairman of the Galco Wood Products board of directors and an officer in each *183 of the other Galco companies. In 1978, the Galco companies faced an uncertain future. Construction of the Alaska Pipeline had spurred demand for building materials, and the cost of materials purchased by the Galco companies for resale to contractors rose rapidly. As the Galco companies' need for cash became more acute, rising interest rates restricted the companies' ability to borrow funds. The Galco companies were soon unable to finance inventories sufficient to meet their customer's needs. Without additional capital, the companies could not continue to expand their operations in Alaska. Petitioner repeatedly and unsuccessfully attempted to find a purchaser for the Galco companies. Henry Van Baalem, then president of Galco Wood Products, courted Laird Norton Company (Laird Norton), a potential purchaser. Booth Gardner, then president of Laird Norton, told Van Baalem that Laird Norton did not have assets sufficient to acquire the Galco companies. Laird Norton was also reluctant to acquire the Galco companies because it had never operated large contractor-oriented lumberyards. Laird Norton's United Building Centers division (UBC) operated approximately 115 archaic lumberyards *184 located near declining midwestern farming communities. UBC's small yards catered primarily to "do-it-yourselfers." Laird Norton consequently felt that it had neither the assets nor the expertise necessary to acquire and operate the Galco companies. Laird Norton and the owners of the Galco companies (the contributing shareholders) eventually agreed to form an entirely new corporation (LNC). Laird Norton contributed the assets of UBC; the contributing shareholders contributed their interests in the Galco companies. Laird Norton exercised its negotiating leverage by insisting that it receive at least 80 percent of the issued LNC stock. The remaining LNC stock was insufficient to compensate the contributing shareholders for their interests in the Galco companies. The contributing shareholders consequently received LNC stock, LNC 8-percent subordinated convertible debentures, and LNC 5-percent subordinated notes. The notes were not intended to compensate the contributing shareholders for any specific assets of the Galco companies, nor were the notes intended to enable LNC to meet its current liabilities. Several minor shareholders received cash. Petitioner agreed to allow the *185 owners of minority interests in the Galco companies to choose consideration for their interests first. He received only what was left after the other contributing shareholders had chosen. Although petitioner would have preferred to receive only stock, he received LNC subordinated convertible debentures in the principal amount of $3,962,500 and two LNC notes in principal amounts totaling $1,727,900, in addition to 99,484 shares of LNC stock. Petitioner was the largest minority shareholder of LNC. Petitioner originally understood that he was to receive one 10-year note. LNC instead issued two notes running for consecutive terms of 4 or 5 years. Each note was in the principal amount of $863,950 payable in five equal annual installments of $172,790, with 8-percent interest payable quarterly on the unpaid balance. LNC did not have the right to prepay all or any portion of the notes. The 8-percent interest payable on the notes was comparable to rates available on significantly more secure, seasoned issues and was, therefore, a below market rate. The first principal payment on the first note was payable on August 15, 1978, the date of the exchange; subsequent principal payments were *186 due on August 15 in each of the succeeding 4 years. Interest only was payable on the second note until the first principal payment on August 15, 1983; subsequent principal payments were due on August 15 in each of the succeeding 4 years. Note balances due to the contributing shareholders initially exceeded $5 million and, by the end of LNC's first 4 months of corporate life, totaled approximately $4,600,000. LNC timely paid all principal and interest payments due before the date of trial. The notes were unsecured and unregistered. Although otherwise fully negotiable, the notes provided that, because they were not registered, they could not be transferred on LNC's books, offered, sold, or pledged without the concurrence of LNC's counsel. The notes were subordinate to LNC's present and future indebtedness to banks and institutions. The notes were also subordinate to all present and future long-term debt of LNC. The notes were given equal status with LNC's originally issued subordinated convertible debentures. The notes were subject to LNC's right to offset remaining installments of principal against certain liabilities of each noteholder. In the subscription agreement, the *187 contributing shareholders agreed to indemnify LNC against any loss resulting from breach of the contributing shareholders' representations and warranties. For a period of 2 years following the closing of the subscription agreement, each contributing shareholder could thus be held liable for his or her proportionate share of any undisclosed debts or liabilities of the Galco companies. LNC could offset each noteholder's proportionate share of such debts or liabilities against remaining installments of principle. A problem involving one of the Galco companies' Alaskan personnel suggested that certain financial information submitted by the Galco companies was misrepresented and threatened to trigger the offset provisions of the subscription agreement. The subscription agreement also provided for a right of offset against the debentures and a pledge of 50 percent of each contributing shareholder's stock in LNC. LNC did not agree to retain liquid assets necessary to make note payments. LNC's December 31, 1978, balance sheet portrayed the company's financial position as follows: [2]
L N CORPORATION
CONSOLIDATED BALANCE SHEET
DECEMBER 31, 1978
(in thousands)
ASSETS
CURRENT ASSETS: Cash
$ 2,168 Accounts receivable, less allowances of $475
14,587 Notes receivable from shareholder
1,144 Receivable from Laird Norton Company
134 Other receivables
438 Inventories, at the lower of cost (principally first-in,
first-out) or market
27,079 Prepaid expenses
117 Total current assets
45,667 PROPERTY AND EQUIPMENT, at cost
Used In operations-
Land
4,441 Buildings
12,421 Equipment and fixtures
6,213 Accumulated depreciation
(8,186)
14,889 Nonoperating land and buildings, leased or for sale, less
accumulated depreciation of $185
418 Total property and equipment
15,307 OTHER ASSETS: Investments and notes receivable
920 Prepaid income taxes
705 1,625 Total other assets
1,625 $62,599 LIABILITIES AND SHAREHOLDERS' EQUITY
CURRENT LIABILITIES: Current maturities of long-term debt
$ 772 Notes payable
5,620 Accounts payable
5,319 Accrued expenses
3,697 Income taxes payable
1,866 Total current liabilities
17,274 ACCRUED DEFERRED COMPENSATION
825 DEFERRED INCOME TAXES
127 NOTES AND CONTRACTS PAYABLE, net of current maturities
1,721 SUBORDINATED DEBENTURES, net of current maturities
3,999 CONVERTIBLE SUBORDINATED DEBENTURES
3,079 Total liabilities
27,025 SHAREHOLDERS' EQUITY: Common stock, $1 par value, 1,000,000 shares authorized,
649,185 issued and outstanding
649 Capital in excess of par value
32,853 Retained earnings
2,072 Total shareholders' equity
35,574 $62,599 *188 Assets described on LNC's financial statement included old inventory, dated accounts receivable and substandard plants and equipment. LNC's business was cyclical. During the cold winter months, business was down, inventories were reduced, and the company's cash balances were at their highest. LNC's December 31, 1978, financial statements thus depicted the company in its most favorable financial position of the year. LNC nevertheless needed additional cash assets to finance, among other things, inventories and receivables during the coming season. LNC also planned substantial capital investments to upgrade its substandard facilities. Overhead was expected to increase as the company expanded into new market areas. After extensive discussions, participants in the exchange consequently agreed to devote LNC's liquid assets to inventory financing, capital improvements, and expansion. The participants believed that the new company would also need to borrow substantial amounts of capital. During LNC's first 4 months of operations, short-term bank debt averaged approximately $8 million and peaked *189 at over $11 million; long-term debt to institutional lenders totalled $1.8 million. Note and debenture payments were thus to come from future operating income. Petitioner and Van Baalem were appointed to the LNC board of directors to provide the expertise necessary to assure sufficient operating income. They have served on the board of directors since the company's inception. LNC also faced other difficulties. Lumber prices were rising steadily; large contractors had begun to deal directly with manufacturers, bypassing distributors such as LNC. Employment and costs were high; LNC had difficulty recruiting prudent business people. OPINION Section 351 provides that, in certain circumstances, gain will not be recognized when property is transferred to a corporation solely in exchange for that corporation's "stock or securities." Section 351(a). Gain will be recognized to the extent of the fair market value of "other property" received in addition to "stock or securities." Section 351(b). Petitioner maintains that the notes were "securities"; respondent contends that they were "other property." "Securities" represent the taxpayer's continuing interest in the incorporated *190 enterprise. Section 351 provides that gain will not be taxed "where in a popular and economic sense there has been a mere change in the form of ownership and the taxpayer has not really 'cashed in' on the theoretical gain, or closed out a losing venture." Portland Oil Co. v. Commissioner,109 F.2d 479, 488 (1st Cir. 1940). The taxpayer's continuing interest in the enterprise may be represented by certain promissory notes as well as by stock. See, e.g., United States v. Mills,399 F.2d 944 (5th Cir. 1968); United States v. Hertwig,398 F.2d 452 (5th Cir. 1968); Campbell v. Carter Foundation Production Co.,322 F.2d 827 (5th Cir. 1963); Burnham v. Commissioner,86 F.2d 776 (7th Cir. 1936), affg. 33 B.T.A. 147 (1935); D'Angelo Associates, Inc. v. Commissioner,70 T.C. 121, 133 (1978); Nye v. Commissioner,50 T.C. 203, 212-214 (1968). Notes that are essentially the equivalent of cash do not represent a continuing interest in the enterprise and consequently are not "securities" for the purpose of section 351. See, e.g., Pinellas Ice & Cold Storage Co. v. Commissioner,287 U.S. 462 (1933). *191 In Camp Wolters Enterprises Inc. v. Commissioner,22 T.C. 737, 750 (1954), affd. 230 F.2d 555 (5th Cir. 1956), we observed that the line between securities and short-term notes that are not securities "is drawn somewhere between long-term bonds and short-term notes." Short-term notes often are not securities within the meaning of section 351. See, e.g., Pinellas Inc. Co. v. Commissioner,supra;Turner v. Commissioner,303 F.2d 94 (4th Cir. 1962), affg. on this issue a Memorandum Opinion of this Court; Adams v. Commissioner,58 T.C. 41 (1972). Respondent maintains that the LNC notes, which matured over consecutive terms of 4 and 5 years, are short-term notes that cannot be securities. We disagree. The term of a note is an important factor to be considered but is not necessarily determinative of the issue: The test as to whether notes are securities is not a mechanical determination of the time period of the note. Though time is an important factor, the controlling consideration is an over-all evaluation of the nature of the debt, degree of participation and continuing interest in the business, *192 the extent of proprietary interest compared with the similarity of the note to a cash payment, the purpose of the advances, etc. It is not necessary for the debt obligation to be the equivalent of stock since * * * [the predecessor of section 351] specifically includes both "stock" and "securities." [Camp Wolters Enterprises, Inc. v. Commissioner,22 T.C. at 751.] Short term notes may thus qualify as securities when they represent the taxpayer's continuing interest in the enterprise. Short-term notes may be securities when the properties for which the notes were issued are indispensable to the corporation, when such properties are not to be used for temporary or current corporate needs, and when substantial additional investment is required to assure the corporation's survival. See, e.g., United States v. Mills, Jr.,supra (1-year notes held "securities"); Burr Oaks Corp. v. Commissioner,365 F.2d 24 (7th Cir. 1966), affg. 43 T.C. 635 (1965) (2-year notes held "securities"); Aqualane Shores Inc. v. Commissioner,269 F.2d 116 (5th Cir. 1959), affg. 30 T.C. 519 (1958) (5-year notes held *193 securities"). Even demand notes may qualify as securities when, on the date of issue, payment on the notes at any future time is not foreseeable. D'Angelo Associates, Inc. v. Commissioner,supra.
We must thus determine whether the LNC notes exposed petitioner to the risks of the enterprise on the date of issue. In Camp Wolters Enterprises, Inc. v. Commissioner,supra, the corporate taxpayer issued 89 notes due in five equal installments between the 5th and 9th years after issuance. Unlike LNC, the taxpayer did have the right to prepay the notes; all 89 notes were redeemed within 2 years. We held that we were nevertheless required to "examine the notes as of the date of issuance." 22 T.C. at 752. We concluded that "[i]t seems clear that the noteholders were assuming a substantial risk of * * * [the corporation's] enterprise, and on the date of issuance were inextricably and indefinitely tied up with the success of the venture." 22 T.C. at 752. LNC's timely payment of each installment of interest and principal due before the date of trial consequently has little bearing on our decision. Respondent relies on *194 Bradshaw v. United States,683 F.2d 365 (Ct. Cl. 1982). Bradshaw is factually distinguishable from this case. In Bradshaw, real property was contributed to a corporation in exchange for five promissory notes. The first note matured 2-1/2 years after the exchange; the succeeding notes matured at 1-year intervals. The taxpayer corporation contended that the exchange was not a section 351 transfer, but a sale, and argued that it was thus entitled to a cost basis in the contributed property. The Court of Claims agreed. The court found that the notes did not subject their holder to a high degree of risk. 683 F.2d at 374. The notes were not subordinated, and payment was not dependent on the success of the business enterprise. 683 F.2d at 373-374. Extensive improvements were not required to convert the property into an income-producing asset, and, if additional capital should become necessary, the corporation could borrow funds from a partnership controlled by its sole shareholder. Because the notes did not represent exposure to a significant risk of loss, the court distinguished Burr Oaks,Aqualane Shores, and United States *195 v. Hertwig,supra. The court held that the notes were not securities. 683 F.2d at 377. An overall evaluation of the notes given to petitioner reveals that they, unlike the notes at issue in Bradshaw, were securities within the meaning of section 351. The LNC notes "did not evidence an isolated transaction of purchase and sale subsequent to and separate from the formation and capitalization" of LNC. See D'Angelo Associates, Inc. v. Commissioner,70 T.C. at 134. The notes were instead an integral part of the incorporation of LNC, and represented one form of petitioner's continuing interest in the assets of the Galco companies. See D'Angelo Associates, Inc. v. Commissioner,supra;Camp Wolters Enterprises v. Commissioner,supra.Petitioner's contribution of his controlling interests in the Galco companies was indispensable to the formation and operation of LNC. The assets and operations of the Galco companies were in no sense short-term advances to be used by LNC for temporary or current corporate needs. See D'Angelo Associates, Inc. v. Commissioner,70 T.C. at 134; Neville Coke & Chemical Co. v. Commissioner,148 F.2d 599 (3d Cir. 1945), *196 affd. 3 T.C. 113 (1944). The LNC notes were not the equivalent of cash. They were unsecured, unregistered, and virtually unmarketable. Moreover, LNC did not agree to retain liquid assets sufficient to retire the notes. LNC's December 31, 1978, balance sheet depicts the company's condition in midwinter, when its inventories were low and its cash reserves were at their highest. Note balances due to the contributing shareholders initially exceeded $5 million and, by the end of LNC's first 4 months of corporate life, totaled approximately $4,600,000. LNC's cash assets of slightly more than $2 million were insufficient to take care of the company's needs in the upcoming season; many of the company's accounts receivable were old and much of its inventory was difficult to sell. Immediate repayment of the notes therefore could have been accomplished only through the sale of LNC's operational assets, "and such a sale would have extinguished the purpose for which * * * [the company] was created." D'Angelo Associates, Inc. v. Commissioner,70 T.C. at 134. Petitioner consequently remained exposed to the risks of the enterprise. On the date of issue, *197 there was a strong possibility that petitioner would remain so exposed for an indefinite period of time. Unlike the notes at issue in Bradshaw, the LNC notes were subordinated to all present and afteracquired bank debt, institutional debt, and long-term debt. LNC was in need of additional borrowed capital for expansion and capital improvements. After its first 4 months of operations, its short-term bank debt averaged about $8 million; the company also carried substantial long-term bank debt. The exchange participants realized that LNC would have to repay the notes out of its future earnings. Petitioner and Van Baalem were appointed to the LNC board of directors to assure the production of those earnings. The notes were also subject to the offset provisions of the subscription agreement. A personnel problem in Alaska raised the spectre of misrepresentation and threatened to trigger these provisions. Although the offset provisions applied to LNC's subordinated debentures as well as to its notes, LNC probably would have exercised its rights against the notes first, because they bore a higher interest rate and required larger immediate principal payments. LNC faced many of *198 the difficulties that had plagued the Galco companies. Rising interest rates and increasing commodity prices could be expected to exacerbate the company's need for cash. According to the testimony, the cost of labor in Alaska was high and a prevalent "get rich quick" attitude made it difficult to recruit prudent managers. The traditional position of materials suppliers had weakened as large contractors, the principal customers of the Galco companies, began to deal directly with the manufacturers. Each of these factors demonstrates that, although LNC made payments due on the date of issue, there was a significant risk that the company would delay or never make subsequent note payments. LNC's ability to timely pay each installment of principal and interest due before the date of trial may have been in large part the result of petitioner's efforts. Petitioner, who was the most substantial minority shareholder of LNC, had actively served as one of its directors since its formation. We conclude that petitioner's notes represented another form of his continuing proprietary interest in LNC. The notes were "securities" for the purposes of section 351. In view of our determination *199 that the notes in dispute were securities, it is not necessary to determine the fair market value of petitioner's notes on the date of the section 351 transaction. To reflect the concessions of the parties, Decision will be entered under Rule 155.
Footnotes
1. Unless otherwise indicated, all statutory references are to the Internal Revenue Code of 1954, as amended and in effect during the years in issue.↩
2. The LNC subordinated notes are accounted for as "subordinated debentures."↩