OPINION. Black, Judge-. The principal question for determination in this proceeding is whether, for the purpose of determining the petitioner’s equity invested capital under section 718 (a) (2) of the Internal Revenue Code[1] for the years 1942 and 1943, the petitioner is entitled to include property paid in for stock at cost to it when acquired on February 26,1930, at the time of its organization, or required to use the adjusted cost of such property to F. E. Mojonnier and his wife, the transferors, on that date. Petitioner contends that in the computation of its equity invested capital it is entitled to include property paid in for stock at the cost of the property, viz., the fair market value of the assets when acquired by it on February 26, 1930. Petitioner contends that this fair market value on the basic date was not less than $240,000. Respondent, on the other hand, contends that for the purpose of computing its equity capital the petitioner is required to use the adjusted cost basis of the assets in the hands of the trans-ferors, which he determined in the deficiency notice was $114,569.47 on the basic date, and that petitioner is now estopped to claim a stepped-up basis. Section 718 (a) of the code provides that, in determining equity invested capital, “property * * * paid in for stock” shall be included in an amount equal to its basis (unadjusted) for determining loss upon sale or exchange. Section 113 (a) of the Revenue Act of 1928 provides that the basis of property for determining gain or loss shall be the cost of such property, unless it comes under one of the exceptions specified in section 113 (a). Section 113 (a) (8) provides that if the property was acquired after December 31, 1920, by a corporation by the issuance of its stock or securities in connection with a transaction described in section 112 (b) (5), the basis shall be the same as it would be in the hands of the transferors. If the exchange herein was one in which gain or loss is recognized, then in computing its equity invested capital petitioner is entitled to include the property paid in for stock at the cost to it on the date of its acquisition. If, on the other hand, the exchange was one in which gain or loss is not recognized, then in computing its equity invested capital petitioner is required to use the adjusted cost basis of the property paid in for stock in the hands of the transferors. Whether the transaction was a taxable or nontaxable exchange depends upon whether or not the trans-ferors of these assets were in “control” of the petitioner immediately after the transfer on February 26,1930, within the meaning of section 112 (b) (5) and (j) of the Revenue Act of 1928.[2] The term “control” as defined in section 112 (j) of that act means “the ownership of at least 80 per centum of the voting stock and at least 80 per centum of the total number of shares of all other classes of stock of the corporation.” The facts show that the transferors, the Mojonniers, owned and operated a greenhouse and produce business in Walla Walla for many years prior to 1930. In 1923 there was a contract with their foreman, Fred A. Hills, providing for the incorporation of transferors’ business in seven years. Hills was to receive a one-tenth interest in the stock of the corporation under that contract in consideration for his services through the years to 1933. Harold Mojonnier, the transferors’ son, was attending the University of Washington in 1926. His parents requested him to leave the university to assist in the operation of the business and said that, if he did so, when the business was incorporated he would be issued stock therein. Harold accepted his parents’ proposal and did not return to the university after the spring of 1926, but devoted his entire time to his parents’ business at a salary of from $150 to $175 per month until the formation of petitioner in 1930. Lewis D. Felch, the transferors’ son-in-law, in 1927 was engaged in business as an engineer in Seattle, Washington, and in the fall of that year, the transferors’ business having expanded considerably, they requested him to come to work for them, stating that, if he did, stock would be issued to him in the corporation which was to be formed. Felch thereupon in 1928 started working for the transferors at a salary of from $150 to $175 a month, which was less than he had been receiving as an engineer. On February 25, 1930, the petitioner was organized with an authorized capital of 3,000 shares of no par value common stock. F. E. Mojonnier made a written proposal at the organization meeting on February 26, 1930, whereby he offered to convey to the corporation the real property owned by himself and his wife, together with all the other assets of the business, for which 1,240 shares were to be issued to himself, 250 shares to his wife, 250 shares to Harold D. Mo-jonnier, 150 shares to Claire D. Felch, 100 shares to Lewis D. Felch, and 10 shares to F. A. Hills, and the remaining 1,000 shares were to be held as treasury stock. The certificates for the various shares of stock were issued directly to these persons in accordance with the offer. Thus, F. E. Mojonnier and his wife, after the transfer, together owned 1,490 shares out of the total of 2,000 shares, which was 74.5 per cent of the petitioner’s outstanding capital stock. This they owned as community property under the laws of the State of Washington. The evidence shows that the entire transaction herein was in good faith and the stock was issued to F. A. Hills, Harold Mojonnier, and Lewis D. Felch in accordance with the agreement that the Mojonniers had made with them several years prior thereto. Although no specific number of shares was promised to Harold Mojonnier and Felch at the time they were induced to enter the transferors’ business, the stock which was issued to them at the time of petitioner’s incorporation was issued pursuant to the agreement, and it was so understood by all the parties. We do not think that the fact that 150 shares were issued to Claire D. Felch, the daughter and Felch’s wife, is material. The stock was issued to Felch and his wife in consideration of Felch giving up his engineering profession and entering the transferors’ business. The testimony of the several parties to the transactions well establishes that fact. Respondent argues that in substance the transaction was a transfer of the entire business by the transferors in exchange for all of the stock and thereafter a series of gifts by them to members of their family. We do not agree with respondent’s contention that there was a gift of the stock herein. A gift is a voluntary transfer of property from one to another without consideration. Noel v. Parrott, 15 Fed. (2d) 669. Here there was consideration. It was in the nature of a reward for past services and an acknowledgement of the trans-ferors’ promise to their son and son-in-law to give them stock in the corporation in consideration of their giving up a college course and the engineering profession, respectively, in order to enter the trans-ferors’ business. See Williston, Contracts (2d Ed.), sec. 100; Finlay v. Swirsky, 103 Conn. 624; 131 Atl. 420. The facts in this case have features somewhat similar, we think, to those in Florida Machine & Foundry Co. v. Fahs, 73 Fed. Supp. 379; affd., 168 Fed. (2d) 957. In that case Franklin G. Russell, Sr., for some years prior to 1912 was the sole proprietor of a business which was engaged in making machine castings and doing general foundry and machine work. After his son graduated from college in 1916 he entered his father’s business, where he served in various capacities. Beginning about 1920, the father and son discussed plans for the son to acquire a half interest in the business and ultimately to succeed his father as general manager. About 1921 the father and son reached an agreement that the son was to have a half interest in the business in consideration for the son staying in the business and operating it. In order to carry out this agreement a corporation was organized on July 24,1924, wherein Russell, Sr., conveyed to the corporation all of the assets of the business individually owned by him for stock, of which 1,181 shares were issued to him, 1,176 shares to the son, and 3 shares to other persons. The court found that Russell, Sr., owned less than 80 per cent of the capital stock of the taxpayer corporation immediately after the transfer of the stock to it on July 24, 1924, and therefore did not have “control” of the corporation “immediately after the transfer” as defined in section 112 (h) and (b) (5) of the code. The court stated in part as follows: * * * There is no evidence oí subterfuge or evasion — no evidence that Mr. Russell sought to conceal a personal control of the corporation by formally placing one-half of the capital stock in his son’s name. To the contrary, it appears that the entire transaction was regular and in good faith, for the declared purpose of bringing his son into the busines as a one-half owner, so that the son could and would carry on this long-standing family business after the retirement of his father, who was then getting along in years. * * * We hold, therefore, that, since the transferors herein owned less than 80 per cent of the capital stock of petitioner immediately after the transfer of the real property and other assets on February 26, 1930, they Were not in control of petitioner immediately after the exchange within the meaning of section 112 (b) (5) and (j) of the Revenue Act of 1928 and, therefore, the transaction was a taxable exchange. Florida Machine & Foundry Co. v. Fahs, supra; Heberlein Patent Corporation v. United States, 105 Fed. (2d) 965; Bassick v. Commissioner, 85 Fed. (2d) 8. Cf. Hazeltine Corporation v. Commissioner, 89 Fed. (2d) 513. Respondent, in contending that the transaction constituted a nontaxable exchange within the meaning of section 112 (b) (5), cites and principally relies upon Wilgard Realty Co. v. Commissioner, 127 Fed. (2d) 514. We think this case is distinguishable on its facts. In that case the taxpayer was organized by one Chamberlin, who conveyed to the corporation certain property in return for 197 shares of its capital stock. On the same date Chamberlin, on receipt of the stock issued in his name, made a gift of 156 shares, transferring without consideration 39 shares each to his brother and his 3 children. It was pointed out that the stock was a gift to his relatives, which the transferor could make or withhold at his pleasure. He was not bound to give the stock away when he received it and he was free at any time to change his mind and use it for any lawful purpose, which would “include the use of it to control the petitioner [the taxpayer] for as long as he desired.” In the instant proceeding, however, the stock, exclusive of the 1,490 shares issued to Mojonnier and his wife, was not issued to the trans-ferors and then conveyed by them to members of their family, but was issued directly to the members of the family in accordance with the plan and offer of F. E. Mojonnier. Thus, the transferors were never the owners or holders of a sufficient amount of stock to place them in “control” of the corporation within the meaning of section 112 (j). Cf. Heberlein Patent Corporation v. United States, supra. Issue of Estoppel. Respondent, however, maintains that the petitioner is estopped to now claim that the 1930 transaction constituted a taxable exchange. He bases his claim for estoppel on the fact that F. E. Mojonnier and his wife did not report a gain on the transfer of the assets to petitioner at the date of its formation on February 26, 1930, and escaped taxation on the gain derived from the exchange and, since the statute of limitation has run against the collection of taxes against the trans-ferors for those years, the petitioner is estopped to claim a higher basis for the assets transferred to it than the adjusted cost basis of the assets in the hands of the transferors. We do not think the omission on the part of the transferors to report a taxable gain arising from the transfer of their assets to the petitioner estops the petitioner from claiming that the exchange was a taxable transaction. There can be no estoppel against the petitioner for the acts of its transferors, who were not in control of the petitioner immediately after the transfer and who acted in good faith. Florida Machine & Foundry Co. v. Fahs, supra. In the latter case the court said: We further find no merit in the argument that taxpayer should be required to use the basis of its transferor, Franklin G. Russell, Senior, because of the latter’s failure to report the transfer in 1924. There can be no estoppel against taxpayer for the act of its transferor, who was not in control oft taxpayer corporation immediately after the transfer, and who was shown to have acted in good faith. After an examination of all the evidence on the issue of estoppel, we conclude that, if the transferors were required to report additional income in 1930 as a result of the exchange, the failure to report it was caused by a mistake of law and not because of any intent on the part of the petitioner or the transferors to mislead. See Hawke v. Commissioner, 109 Fed. (2d) 946. The revenue agent who examined petitioner’s books and records as early as 1932 seems to have been fully advised as to what took place upon the organization of petitioner on February 26,1930. We are of the opinion and we hold that no estop-pel has been shown. Fair Market Value of the Property. Since we have held that the transfer to petitioner was not a tax-free transfer under section 112 (b) (5), petitioner, in its computation of equity invested capital, is entitled to include the “property * * * paid in for stock” at “its basis (unadjusted) for determining loss upon sale or exchange.” In Ida L. McKinney, 32 B. T. A. 450, 456; affd., 87 Fed. (2d) 811, we said: It is well settled that the cost to a corporation of the property acquired through the issuance of its capital stock is the fair market value of such capital stock on the date issued, and where all of the capital stock of a corporation is issued for property and there is no other method of measuring the fair market value of the stock so issued, such fair market value on that date may properly be determined to be the equivalent of the fair market value of the property received. Reliance Investment Co., 22 B. T. A. 1287; Mead Realty Co., 21 B. T. A. 1062; L. H. Philo Corporation, 16 B. T. A. 130; John Glackner Realty Corporation, 11 B. T. A. 151; Realty Sales Co., 10 B. T. A. 1217. Cf. Independent Oil Co., 6 T. C. 194. What was the fair market value of the assets acquired by petitioner on February 26, 1930? The fair market value of property is “the price which property will bring when offered by a willing seller to a willing buyer, neither being obligated to buy or sell.” Elmhurst Cemetery Co. v. Commissioner, 300 U. S. 37. Petitioner contends that the fair market value of the assets acquired by petitioner at the time of the transfer was not less than $240,000. Respondent, on the other hand, contends that the fair market value of the assets received by the petitioner was not in excess of $195,000. We have carefully examined all the evidence in the record on this issue, and we think it supports the contention of respondent that the property did not have a fair market value in excess of $195,000. All the documentary evidence at the time of the transaction, of which there is considerable, shows that all the parties regarded the property which the Mojonniers were transferring to petitioner as having a fair market value of $195,000 at the time of the transfer. Notwithstanding the evidence upon which petitioner lays much stress in its brief, we are not convinced that these assets had a greater fair market value than $195,000, but we are convinced they did have that much value. Therefore, upon the evidence, we have made an affirmative finding that these assets had a fair market value of $195,000 on February 26, 1930. That figure should be used in determining petitioner’s equity invested capital for the taxable years in question. Reviewed by the Court. Decision will he entered under Rule 50. SEC. 718. EQUITY INVESTED CAPITAL. (a) Definition. — The equity invested capital for any day of any taxable year shall be determined as of the beginning of such day and shall be the sum of the following amounts, reduced as provided in subsection (b)— (1) Money paid in. — Money previously paid in for stock, or as paid-in surplus, or as a contribution to capital; (2) Property paid in. — Property (other than money) previously paid In (regardless of the time paid in) for stock, or as paid-in surplus, or as a contribution to capital. Such property shall be included in an amount equal to its basis (unadjusted) for determining loss upon sale or exchange. * * * SEC. 112. RECOGNITION OE GAIN OR LOSS. (a) General Role. — Upon the sale or exchange of property the entire amount of the gain or loss, determined upon section 111, shall be recognized, except as hereinafter pro* vided In this section. (b) Exchanges Solely in Kind. ******* (5) Transfer to corporation controlled by transferor. — No gain or loss shall be recognized If property Is transferred to a corporation by one or more persons solely In exchange for stock or securities in such corporation, and Immediately after the exchange such person or persons are in control of the corporation; but in the case of an exchange by two or more persons this paragraph shall apply only If the amount of the stock and securities received by each is substantially in proportion to his interest in the property prior to the exchange. **•*••• (J) Definition of Control. — As used in this section the term “control” means the ownership of at least 80 per centum of the voting stock and at least 80 per centum of the total number of shares of all other classes of stock of the corporation.