D'ANGELO ASSOCIATES, INC., PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 4020–75. Filed May 2, 1978.

Joseph P. D'Angelo (an officer), for the petitioner.
*George W. Connelly, Jr.*, for the respondent.

WILBUR, *Judge:* Respondent determined a deficiency in petitioner's Federal income tax for the taxable year ended June 30, 1970, in the amount of $1,453.44. Because of concessions made by the parties, the following questions remain for our decision:

(1) What is the proper basis for depreciating assets petitioner acquired shortly after incorporation. This question turns upon whether the transfer of these assets to petitioner constituted a nontaxable exchange within the provisions of section 351(a).[1]

(2) Whether the premiums paid by petitioner for insurance on the life of Dr. Joseph P. D'Angelo are an ordinary and necessary expense of petitioner deductible under section 162(a).

(3) To what extent expenses claimed with respect to the operation of vehicles owned by petitioner are deductible under sections 162(a) and 167(a).

## FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts, together with the attached exhibits, are incorporated herein by this reference.

Petitioner D'Angelo Associates, Inc., is a New York corporation having its principal place of business in Buffalo, N. Y., at the time the petition herein was filed. Petitioner employs the cash receipts and disbursements method of accounting and timely filed its Federal corporate income tax return for its fiscal year ended June 30, 1970, with the Internal Revenue Service Center at Andover, Mass.

---

[1] All statutory references are to the Internal Revenue Code of 1954, as in effect during the taxable year under consideration.

Petitioner was incorporated on or about June 21, 1960, by Harry T. Dixon, Anthony J. DeMarie, and Norman A. Szymoniak. Upon incorporation, or shortly thereafter, the three qualifying shares owned by Dixon, DeMarie, and Szymoniak were retired, and petitioner issued 60 shares of no-par-value common stock. At the direction of Dr. and Mrs. D'Angelo, 10 of these 60 shares were issued to Mrs. D'Angelo, and the remaining 50 shares were issued in the names of the five D'Angelo children, 10 shares to each, who at the time of issuance were aged 12, 10, 9, 8, and 6. The shares issued to the D'Angelo children were, and have been, held in trust for them by Dr. D'Angelo under the New York State Uniform Gifts to Minors Act.[2]

These 60 shares were issued in consideration for $15,000 cash transferred to the corporation by Dr. D'Angelo. This cash was partly from his earnings as a dentist and partly from a $45,000 mortgage loan obtained during March 1960 by Dr. and Mrs. D'Angelo.

As the children have reached their majority, their shares have been issued to them, and except as previously stated, there have to date been no changes in the stockholdings in petitioner. From the time of its formation to the time of trial, petitioner paid no dividends to its shareholders, nor did it pay any salaries to its officers.

On or about June 30, 1960, a few days after petitioner's incorporation, the following property was transferred to petitioner by Dr. and Mrs. D'Angelo:

| Property | Date of acquisition | Cost | Depreciation claimed through June 30, 1960 | Adjusted basis | Price to petitioner |
|---|---|---|---|---|---|
| 810 Abbott property[1]: Land and improvements | 2/4/53 | $98,000.00 | $12,150.00 | $85,850.00 | $135,000 |
| Various office equipment | 1949–59 | 19,066.36 | 13,617.11 | 5,449.25 | 15,000 |
| Air conditioning system | 1960 | 5,986.00 | | 5,986.00 | 5,986 |

[1]The indenture transferring the real property to petitioner is dated June 9, 1960.

[2]See N.Y. Pers. Prop. Law sec. 265 et seq. (McKinney Supp. 1961); N.Y. Est., Powers & Trusts Law sec. 7–4.1 et seq. (McKinney 1967).

The consideration received by the D'Angelos in exchange for these properties totaled $155,986.03,[3] which consisted of $15,000 cash; the assumption by petitioner of a $44,258.18 liability remaining with respect to a $45,000 mortgage on the 810 Abbott property; and the issuance on June 30, 1960, of an interest-bearing (6-percent) corporate note, payable upon demand to Dr. D'Angelo in the principal amount of $96,727.85. Petitioner also issued on June 30, 1960, for an unspecified consideration, a 6-percent corporate note payable upon demand to Dr. D'Angelo in the principal amount of $15,000. The gain from the June 30, 1960, transfer of property was reported by Dr. D'Angelo and his spouse on their joint Federal income tax return for 1960 as a long-term capital gain in the amount of $58,700.25. This capital gain was entirely consumed by virtue of long-term capital loss carryovers from prior taxable years in excess of $100,000.

The 810 Abbott property which was transferred to petitioner in June 1960 is improved real property. This property is comprised of three contiguous city lots located in Buffalo, N. Y., and was acquired on December 4, 1953, by Dr. D'Angelo. Sometime thereafter and prior to 1959, Dr. D'Angelo had constructed on the center lot a two-story building, including basement, with portions of the three lots being improved for use as parking lots. Dr. D'Angelo, at all times here pertinent, used and occupied these premises as a medical center and for his dental practice, leasing portions of the building from petitioner after the June 1960 transfer, at first individually and later doing business as the Dade Dental Hospital. Portions of the building not leased to Dr. D'Angelo or his Dade Dental Hospital were leased by petitioner to other medical practitioners and entrepreneurs providing principally medical support services.

On March 16, 1959, Dr. D'Angelo transferred title to the 810 Abbott property to Grace; no consideration was given Dr. D'Angelo for this transfer. On March 31, 1960, Dr. and Mrs. D'Angelo obtained a loan in the amount of $45,000 from the Manufacturers & Traders Trust Co. of Buffalo, N. Y. (hereinafter the M. & T. Bank), the loan being secured by a mortgage on the 810 Abbott property. It was this liability that was assumed

---

[3]The small discrepancy between the amount realized of $155,986.03 and the recited selling price of $155,986 is not explained. In addition, a small discrepancy between the amount of gain reported with respect to the purported sale, $58,700.25, and the difference between the amount realized and the total adjusted basis of the property transferred to the petitioner, $58,700.78, is not explained.

by the petitioner as part of the consideration for the June 1960 transfer of property to petitioner, and satisfied ultimately by petitioner during April 1968.

For many years Dr. D'Angelo envisioned the development of a specialized facility to provide dental care and treatment to persons whose handicaps prevented effective treatment in a normal office environment. In order to transform Dr. D'Angelo's office located at the 810 Abbott property into such a facility, considerable capital was required. Therefore, on or about August 8, 1962, Dr. D'Angelo (doing business as Dade Dental Hospital) applied to the Small Business Administration (SBA) for a loan in the principal amount of not less than $75,000 for the purpose of undertaking such a project. This initial application was rejected by the SBA.

Upon resubmission of the loan application and its reconsideration, the SBA in August 1963 issued its authorization for SBA participation in the financing. Under the terms of the authorization, $7,500 of the principal amount was provided by the SBA at 6-percent interest, and the balance was provided by the M. & T. Bank at the rate of 4-percent interest. The proceeds of the loan were used by Dr. D'Angelo as follows: $25,900 to complete building alterations to the 810 Abbott property; $28,500 to retire installment loans of Dr. D'Angelo and his affiliates, including $9,000 to cover repayment of some interim financing; and the balance for operating expenses of the Dade Dental Hospital.

The $75,000 loan was evidenced by a note payable to the M. & T. Bank executed August 15, 1963, by Dr. D'Angelo for the Dade Dental Hospital. This loan was repayable in monthly installments over 10 years at the interest rates prescribed in the authorization, with all payments of principal and interest to be made to the bank. This borrowing was fully repaid by September 15, 1973.

The security for this loan to Dr. D'Angelo took several forms. Petitioner was required to execute a mortgage on the 810 Abbott land, subject to a prior mortgage lien thereon held by the M. & T. Bank, and a first chattel mortgage covering its machinery and equipment then owned or thereafter acquired with loan proceeds. Moreover, the petitioner, Dr. D'Angelo, and Mrs. D'Angelo were each required to guarantee the principal amount of the indebtedness. These mortgages and guarantees were all executed by August 15, 1963. In addition, petitioner, by

virtue of its status as a guarantor of the SBA loan to Dr. D'Angelo, was prohibited from making any payments of principal or interest (including that previously accrued) on its $111,727.85 in obligations to Dr. D'Angelo during the term of the SBA loan. This subordination of Dr. D'Angelo's claims against petitioner to the guarantee was imposed by the SBA over Dr. D'Angelo's request that the prohibition on interest payments be waived by the SBA.

Petitioner observed this prohibition on payments of principal and interest to Dr. D'Angelo at all times prior to March 1, 1971. At various times thereafter, Dr. D'Angelo employed a system of bookkeeping devised to free cash for his use without violating the terms of the SBA loan authorization. This process involved the matching of portions of rental payments from Dr. D'Angelo to petitioner for use of the 810 Abbott property. Petitioner would hold and not negotiate the rent checks thus matched. At the time of trial, petitioner's June 30, 1960, obligation in the principal amount of $96,727 had been reduced in this manner to $48,902.85:

| Year | Amount paid | Balance |
|------|------------|---------|
| 1970 | ..................................... | $96,727.85 |
| 1971 | ...................... $8,975 | 87,752.85 |
| 1972 | ...................... 7,350 | 80,402.85 |
| 1973 | ...................... 12,000 | 68,402.85 |
| 1974 | ...................... 12,500 | 55,902.85 |
| 1975 | ...................... 2,500 | 53,402.85 |
| 1976 | ...................... 4,500 | 48,902.85 |

During 1972, Dr. D'Angelo employed the above-described system to make one interest payment. Other than those payments, no payments of principal or interest were made on petitioner's $96,727.85 obligation to Dr. D'Angelo. Moreover, as of trial no payments of principal or interest had been made by petitioner on the $15,000 note issued on June 30, 1960.

The SBA authorization also required the assignment of insurance in the amount of $75,000 on the life of Dr. D'Angelo. In partial satisfaction of this requirement, Dr. D'Angelo pledged two existing life insurance policies as collateral. In addition, petitioner secured a third policy, issued on April 3, 1963, by the International Life Insurance Co. on the life of Dr. D'Angelo. On August 15, 1963, petitioner assigned the latter policy as

collateral for the loan. The assignment specifically reserved the right to change the beneficiary as long as the rights of the assignee were not impaired. This latter policy was term life insurance, and petitioner paid $600.75 for premiums thereon during the taxable year ended June 30, 1970.

During the taxable year at issue, petitioner owned assets in addition to the 810 Abbott property. These additional assets consisted of two rental properties in the Buffalo area, a 1967 Chrysler, and an International Harvester 4-wheel drive vehicle (the Scout). The Scout, which was equipped for use as a snowplow, and the Chrysler were used by petitioner, at least in part, to maintain the real properties owned by petitioner.

On its Federal corporate income tax return for the fiscal year ended June 30, 1970, petitioner claimed depreciation on the 810 Abbott property, as well as the furniture and fixtures and equipment, in the amount of $5,250. The allowance for depreciation was computed by petitioner in accordance with its treatment of the June 1960 transfer of the building and equipment as a sale, which characterization resulted in an original adjusted basis in this property exceeding by $58,700.75 the adjusted basis of the transferors at the time of transfer. Petitioner also claimed a deduction in the amount of $600.75 for the premium paid for insurance on the life of Dr. D'Angelo.

Additionally, petitioner claimed a deduction of $2,730.05 in connection with the operation of its two vehicles identified on its return as follows:

| Item | Amount | Item | Amount |
|---|---|---|---|
| Gas and oil —automobile | $878.90 | Insurance (Chrysler) | $426.00 |
| License fees | 55.25 | Insurance (Scout) | 181.00 |
| Depreciation (Chrysler) | 888.90 | Depreciation (Scout) | 300.00 |

In the statutory notice of deficiency, respondent allowed a portion of the depreciation deduction claimed by petitioner with respect to the property transferred to petitioner in June 1960, in the following amounts:

| | Depreciation claimed | Depreciation allowed |
|---|---|---|
| Building | $3,900 | $2,196.22 |
| Equipment | 1,350 | 343.66 |

The adjustment in the depreciation deduction was based on respondent's determination that the June 1960 transfer was an

exchange within the meaning of section 351 and not a sale, with the consequence that petitioner had overstated its basis in the transferred assets. In addition, respondent disallowed the $600.75 insurance premium paid by petitioner, and all the vehicular expenses claimed by petitioner (with the exception of $300 depreciation on the Scout) as not being ordinary and necessary business expenses of the petitioner within sections 162(a) and 167(a).

## OPINION

### Issue 1. Applicability of Section 351

This controversy has its origin in events occurring during June 1960. Petitioner was organized on June 21, 1960. Shortly thereafter, initial capital in the amount of $15,000 in cash was transferred to petitioner by Dr. D'Angelo, and petitioner issued 60 shares of common stock, 10 shares to Mrs. D'Angelo and 10 shares each in the names of the five D'Angelo children. On June 30, 1960, Dr. and Mrs. D'Angelo, in a transaction formally designated a sale, transferred various property to petitioner, including the building and equipment whose basis is now at issue. In exchange for this property, the D'Angelos received $15,000 in cash; the assumption by petitioner of a liability of the D'Angelos, secured by a mortgage on property transferred to petitioner; and a 6-percent interest bearing demand note payable to Dr. D'Angelo in the amount of $96,727.85. Thereafter, in claiming depreciation, petitioner treated the transfer as a sale.

We must determine the proper basis for depreciation of the rental property (building and equipment) transferred to petitioner. This issue depends on whether or not section 351 applies to the transfer of this property to the petitioner. Section 351 applies when property is conveyed to a corporation solely in exchange for stock or securities, and immediately after the exchange, the transferors control the corporation.[4] If section 351 is applicable, petitioner must depreciate the transferred assets using the transferors' basis. See sec. 362(a)(1). If section 351 is

---

[4]SEC. 351. TRANSFER TO CORPORATION CONTROLLED BY TRANSFEROR.

(a) GENERAL RULE.—No gain or loss shall be recognized if property is transferred to a corporation * * * by one or more persons solely in exchange for stock or securities in such corporation and immediately after the exchange such person or persons are in control (as defined in sec. 368(c)) of the corporation * * *

inapplicable, and the transfer of assets to petitioner was, as petitioner contends, a sale, depreciation would be based on the purchase price of those assets, a figure concededly greater than the transferors' adjusted basis. Petitioner would accordingly realize larger depreciation deductions. See secs. 167(g), 1011, and 1012.

Respondent contends that the transfer of the rental property to petitioner was pursuant to a nontaxable exchange under section 351(a). He argues that the transfer of cash for stock and the exchange of the rental property for cash and notes were contemporaneous events that were in substance integral parts of a single transaction. Respondent contends that the notes were securities, and finds the requisite control by viewing the purchase of the stock and the exchange of the property for securities as one transaction followed by a gift of stock to the children.

Petitioner, on the other hand, contends that section 351 is inapplicable to the transfer for several reasons. Petitioner asserts that the transfer of the rental property was a transaction separate from the contributions of cash and should be characterized as a taxable sale. Petitioner argues that Dr. and Mrs. D'Angelo never owned more than 10 of the 60 shares outstanding in petitioner (the 50 shares constituting "control" being issued to non-transferors prior to the sale), and that the note received by Dr. D'Angelo was not "stock or securities" within the meaning of section 351. Finally, petitioner argues that section 1239 operates to prevent the application of section 351 in this case.

For the following reasons, we agree with respondent.

a. *Sale or exchange.*—It is well established that the economic substance of a transaction must govern for tax purposes rather than the time sequence or form in which the transaction is cast. *Gregory v. Helvering,* 293 U.S. 465 (1935). Where a series of closely related steps are taken pursuant to a plan to achieve an intended result, the transaction must be viewed as an integrated whole for tax purposes. See *Redwing Carriers, Inc. v. Tomlinson,* 399 F.2d 652, 658 (5th Cir. 1968); *Atlee v. Commissioner,* 67 T.C. 395 (1976).

Petitioner has failed to convince us that a sale took place. The events significant to the creation of petitioner occurred almost simultaneously. The formation of petitioner, the transfer of

$15,000 cash to petitioner for the issuance of 60 shares of stock, and the transfer of the rental property to petitioner for the return of the $15,000 in cash and the notes all occurred within an interval of less than 10 days. See sec. 1.351–1(a)(1), Income Tax Regs. The evidence demonstrates that these steps were integral parts of a plan designed by Dr. D'Angelo to transfer the assets used primarily in his dental practice from individual to corporate ownership.

Any reason for petitioner's existence would have vanished absent the transfer of the rental property in accordance with the overall plan. It is also clear that the unsecured "demand" notes were originally intended and subsequently treated as indefinite obligations to be satisfied when and if the vicissitudes of the rental business (consisting essentially of income from the property transferred) permitted.[5] We believe this record demonstrates a continuing interest by Dr. D'Angelo in the transferred rental property consistent with the policy underlying the nonrecognition provisions of section 351 and unlike that contemplated by a sale. See *Portland Oil Co. v. Commissioner*, 109 F.2d 479, 488 (1st Cir. 1940), cert. denied 310 U.S. 650 (1940); B. Bittker & J. Eustice, Federal Income Taxation of Corporations and Shareholders, par. 3.01, p. 3–4 (3d ed. 1971).

Sequential protocol is of marginal relevance in determining whether contemporaneous events should be viewed as a single integrated transaction or as independent transactions. Rather, the boundaries are defined by including events contemplated for the success of the business plans from which they emanate. *Commissioner v. Court Holding Co.*, 324 U.S. 331 (1945); *United States v. Cumberland Public Service Co.*, 338 U.S. 451 (1950). In this light it is clear that the success of the corporate undertaking motivated both the transfer of cash for stock and the transfer of

---

[5] No interest or principal payments were made for a period of 10 years, see *infra*. Whether a transaction constitutes a sale or exchange, the characterization of an obligation as a stock or security, and the determination of control under sec. 351 are often discussed as separate factors. Given the complexity of many cases arising under sec. 351, and the varying importance and novelty of each factor in a particular case, this may simplify presentation. Nevertheless, the factors are usually interrelated and overlap. Even in those cases that decide a prior finding of a sale dispenses with the necessity of characterizing obligations as notes or securities, the criteria that would have been applied to characterizing the obligations have already been carefully evaluated in deciding the transaction was a sale. See *Curry v. Commissioner*, 43 T.C. 667, 696 (1965), and the cases there cited. In many instances, though possibly not all, this may eliminate the concern that analysis of the words "transferred * * * solely in exchange for stock or securities" (the words of sec. 351) is overlooked in the focus on a "sale" (a word not occurring in sec. 351.) See Note, "Section 351 Transfers to Controlled Corporations: The Forgotten Term—'Securities,'" 114 U. Pa. L. Rev. 314 (1965).

the rental property for the corporate obligation. As we noted in *Nye v. Commissioner*, 50 T.C. 203, 212 (1968):

they gave no reason why the transaction was divided into two parts, the transfer of cash for stock and the purported sale of the business assets for the note. Such evidence might have confirmed that the form in which the transaction was cast was consistent with its true nature. * * * Lack of such evidence is worthy of note because it fails to negate the inference to be drawn from other facts indicating that the two parts of the transaction were inseparably related. * * * In the absence of evidence of a business reason for dividing the transaction, we conclude that a separate sale has not been shown. [Citations omitted]

b. *Control.*—We view the events before us as equivalent to the formation and capitalization of the corporation, followed by a gift to the D'Angelo children of the controlling interest when Dr. and Mrs. D'Angelo caused petitioner to directly issue the 50 shares to the children. At the end of the series of transactions on June 30, 1960, all of the assets remaining in the corporation were contributed by Dr. and Mrs. D'Angelo, including the $15,000 in cash.[6] This cash was in the possession of Dr. and Mrs. D'Angelo both before and after the transfers, with the petitioner merely issuing stock directly to Mrs. D'Angelo and in the names of the children. The D'Angelo children did not purchase the stock issued in their names, but were simply the beneficiaries of a gift from their parents.[7]

---

[6] In all likelihood, the $15,000 in cash remained in the corporation, and was evidenced by the $15,000 demand note payable to Dr. D'Angelo issued by petitioner on June 30, 1960, the same day the $96,727.85 note was issued. Under this assumption the consideration received from petitioner corresponds with the stated "sales" price; if the cash was distributed as well as the $15,000 note, there is an unexplained $15,000 discrepancy. Accordingly, we find that no adjustment in the adjusted basis of the rental property is needed on account of the $15,000 cash. Additionally, since the $15,000 note is a security for the same reasons we find the $96,727.85 note a security (see *infra*), no adjustment in basis would be required.

If, in fact, the $15,000 was returned to the D'Angelos along with the $15,000 demand note, the same result would be required, since the consideration for the transfer of the rental property would be the $15,000 note (along with the stock and other notes), rather than the contemporaneous return of the same $15,000 contributed a few days earlier.

We also note that petitioner does not contend that the assumption of liability for the mortgage by petitioner should be treated as money received by the transferors by reason of sec. 357(b).

[7] As noted earlier, the stock was issued to Dr. D'Angelo as trustee for the children pursuant to the New York State Uniform Gift to Minors Act. Respondent does not argue that the transferors retained control because the trust was illusory or because of the powers Dr. D'Angelo exercised as trustee. In view of respondent's position, we assume for purposes of this case that the trustee acted independently and solely on behalf of the best interests of the beneficiaries, although there is considerable evidence to the contrary. We therefore do not base our decision to any extent on the circumstance that Dr. D'Angelo as trustee acted on behalf of the children; the result would be precisely the same if the children had reached majority when the stock was issued and received title to the stock in their own names.

The loss of control of petitioner resulting from the gift of stock does not preclude the application of section 351(a), which requires that the transferors be in control of the transferee corporation "immediately after the exchange." This requirement is satisfied where, as here, the tranferors transfer by gift the stock they were entitled to receive in exchange for the property they transferred to the corporation, regardless of whether such disposition was planned before or after acquiring control. See *Wilgard Realty Co. v. Commissioner,* 127 F.2d 514, 516 (2d Cir. 1942), affg. 43 B.T.A. 557 (1941), cert. denied 317 U.S. 655 (1942); *Stanton v. United States,* 512 F.2d 13, 17 (3d Cir. 1975); B. Bittker & J. Eustice, Federal Income Taxation of Corporations and Shareholders, par. 3.10, pp. 3-37, 3-38 (3d ed. 1971). The issuance of the stock by petitioner to the D'Angelo children is the direct consequence of "the absolute right" of Dr. and Mrs. D'Angelo to designate who would receive all of the stock. *Stanton v. United States, supra* at 17; *Wilgard Realty Co. v. Commissioner, supra* at 516. Since it is possession of this power which is essential under section 351 for control, it follows that the transferors herein, Dr. and Mrs. D'Angelo, were in control of petitioner immediately after the exchange. See *American Bantam Car Co. v. Commissioner,* 11 T.C. 397 (1948), affd. per curiam 177 F.2d 513 (3d Cir. 1949), cert. denied 339 U.S. 920 (1950).

Petitioner nevertheless argues that since the stock was issued directly to Mrs. D'Angelo and the children, Dr. D'Angelo never held any stock in the corporation. We recognize that the *Wilgard* decision was predicated on the transferor's freedom of action *after* he acquired the stock, and that *Fahs v. Florida Machine & Foundry Co.,* 168 F.2d 957 (5th Cir. 1948), may be read to support petitioner's viewpoint. See also *Heberlein Patent Corp. v. United States,* 105 F.2d 965 (2d Cir. 1939). Additionally, in *Mojonnier & Sons, Inc. v. Commissioner,* 12 T.C. 837 (1949), in distinguishing *Wilgard,* this Court stated:

In the instant proceeding, however, the stock, exclusive of the 1,490 shares issued to Mojonnier and his wife, was not issued to the transferors and then conveyed by them to members of their family, but was issued directly to the members of the family in accordance with the plan and offer of F.E. Mojonnier. Thus, the transferors were never the owners or holders of a sufficient amount of stock to place them in "control" of the corporation within the meaning of section 112(j). Cf. *Herberlein Patent Corporation v. United States, supra.* [12 T.C. at 850.]

Nevertheless, the decisions in both *Wilgard* and *Stanton* were clearly predicated on the power of the transferor to designate who will receive the stock rather than the precise moment that the power was exercised. These cases do not turn on whether the tune Dr. D'Angelo called was written in two-four time, but on his power to call the tune. And it is on this score that both *Florida Machine & Foundry Co.*, and *Mojonnier & Sons, Inc.*, are distinguishable from *Wilgard, Stanton*, and the facts before us.[8] Cf. *Culligan Water Conditioning of Tri-Cities, Inc. v. United States*, 567 F.2d 867 (9th Cir. 1978); *Intermountain Lumber Co. v. Commissioner*, 65 T.C. 1025 (1976).

c. *Note or security.*—We must now determine whether the $96,727.85 demand note constitutes "stock or securities" within the meaning of section 351(a). To dispose of this issue, it is sufficient to determine that the demand note is a security of petitioner.[9] We conclude that that note is a security.

It is well settled that promissory notes may qualify as securities for purposes of section 351. See, e.g., *United States v. Mills*, 399 F.2d 944 (5th Cir. 1968); *Campbell v. Carter Foundation Production Co.*, 322 F.2d 827 (5th Cir. 1963); *Nye v. Commissioner*, 50 T.C. 203, 212–214 (1968). The basic approach for determining whether such debt instruments qualify as "securities" as that term is used in section 351 is that adopted by this Court in *Camp Wolters Enterprises, Inc. v. Commissioner*,

---

[8] If immediately prior to forming the corporation, five-sixths of the rental properties was given to the children and transferred to the corporation in return for the controlling interest (along with their parents' remaining one-sixth interest), petitioner's basis would be the basis of Dr. and Mrs. D'Angelo. Similarly, if the transfers were made directly to the corporation by Dr. and Mrs. D'Angelo in return for stock and the stock then given to the children, petitioner does not seriously contend sec. 351 would be inapplicable. That this transaction has been squeezed into the seemingly nonexistent time interval between these two situations surely cannot produce a different result. *Cf.* sec. 1.351–1(b)(1), Income Tax Regs., and S. Rept. 1622, to accompany H.R. 8300 (Pub. L. 591), 83d Cong., 2d Sess. 264, 265 (1954), which, although not addressing the control problem directly, at least suggest the result we reach. Additionally, the prior precedents, by making the power to designate the distributee of the stock dispositive, avoid potential abuses inherent in options that would otherwise be available to taxpayers. B. Bittker & J. Eustice, Federal Income Taxation of Corporations and Shareholders, par. 3.01, p. 3–4 (3d ed. 1971). *Culligan Water Conditioning of Tri-Cities, Inc. v. United States*, 567 F.2d 867 (9th Cir. 1978).

[9] Actually, it is sufficient to determine that the note constitutes "stock or securities," without determining precisely which. See *Campbell v. Carter Foundation Production Co.*, 322 F.2d 827 (5th Cir. 1963).

At trial, respondent's counsel indicated in his opening statement that the note should also be characterized as equity rather than a debt security. While respondent submits that the indicia of equity are manifestly satisfied, he maintains that the evidence adduced at trial renders unnecessary a determination that the note is equity. Therefore, the issue as presented and argued on brief by the parties is whether the note was a security for purposes of sec. 351.

22 T.C. 737 (1954), affd. 230 F.2d 555 (5th Cir. 1956), cert. denied 352 U.S. 826 (1956):

> The test as to whether notes are securities is not a mechanical determination of the time period of the note. Though time is an important factor, the controlling consideration is an over-all evaluation of the nature of the debt, degree of participation and continuing interest in the business, the extent of propriety interest compared with the similarity of the note to a cash payment, the purpose of the advances, etc. It is not necessary for the debt obligation to be the equivalent of stock since section [351(a)] specifically includes both "stock" and "securities." [22 T.C. at 751.]

Thus, securities are investment instruments which give the holder a continuing participation in the affairs of the debtor corporation. They are to be contrasted with short-term notes which are essentially the equivalent of cash and represent the termination of the holder's interest in the property transferred to the corporation.

An overall evaluation of the $96,727.85 note given to Dr. D'Angelo shows that it was a security within the meaning of section 351. The note did not evidence an isolated transaction of purchase and sale subsequent to and separate from the formation and capitalization of petitioner. Rather, the note was an integral part of the corporate birth, and represented one form of Dr. D'Angelo's continuing interest in the rental property transferred to petitioner. See *Camp Wolters Enterprises, Inc. v. Commissioner, supra.* Moreover, the properties for which the note was issued constituted a permanent contribution of assets virtually indispensable to petitioner; such property did not represent short-term advances to be used by petitioner for temporary or current corporate needs. Cf. *Neville Coke & Chemical Co. v. Commissioner,* 148 F.2d 599 (3d Cir. 1945), cert. denied 326 U.S. 726 (1945); *Wellington Fund, Inc. v. Commissioner,* 4 T.C. 185 (1944).

In no sense was the note the equivalent of cash. See *Pinellas Ice Co. v. Commissioner,* 287 U.S. 462 (1933). It gave Dr. D'Angelo a continuing investment in the property he transferred to petitioner. At the time the note was issued, the petitioner did not have sufficient liquid assets to retire it. Its repayment at any time proximate to the issuance date could have been accomplished only through the sale of the assets transferred to petitioner, and such a sale would have extinguished the purpose for which petitioner was created. As a

practical matter, payment of the note was intended to be derived from the rental earnings of the property transferred, a process that would take many years. Furthermore, any expectation of repayment of the $96,727.85 obligation would realistically be subsequent to the satisfaction of the substantial liability assumed by petitioner upon transfer of the rental property to it, a liability which encumbered the income producing assets.

Petitioner maintains that the $96,727.85 note was not, and is not, a security. It asserts that an unsecured demand note by its very nature cannot constitute a security but is "an instrument of true indebtedness." Petitioner's reliance on the form of the note and the absence of a maturity date is misplaced, and reflects a fundamental misunderstanding of the term "securities" as it is used in section 351.

It is generally true that short-term notes do not constitute securities within the meaning of section 351. See, e.g., *Pinellas Ice Co. v. Commissioner, supra; Commissioner v. Sisto Financial Corp.*, 139 F.2d 253 (2d Cir. 1943), revg. 47 B.T.A. 425 (1942); *Turner v. Commissioner*, 303 F.2d 94 (4th Cir. 1962), affg. on this issue a Memorandum Opinion of this Court, cert. denied 371 U.S. 922 (1962); B. Bittker & J. Eustice, Federal Income Taxation of Corporations and Shareholders, par. 3.04 (3d ed. 1971). However, a short-term note, and demand notes, will be considered securities in circumstances where the stated maturity is either unrealistic (see *Aqualane Shores, Inc. v. Commissioner*, 269 F.2d 116 (5th Cir. 1959), affg. 30 T.C. 519 (1958)); or is ignored by the parties (see *United States v. Mills*, 399 F.2d 944 (5th Cir. 1968)).

In the instant case, there is no evidence to support the possibility of payment of the note on demand at any future time foreseeable at the date of its issuance. No payments of principal or interest were made for over 10 years, and those that were eventually made were accomplished in an unusual manner. As of trial, some 16 years after the date of issuance, only about 50 percent of the principal amount of the note had been credited as paid, and interest payments with one exception have not been made. These facts merely serve to reinforce our conclusion that the note represented a continuing interest of Dr. D'Angelo in the rental property, as contemplated by the *Camp Wolters* approach.

Petitioner attempts to excuse the dilatory payment of the note with the argument that it was prohibited from making payments by the terms of the SBA loan authorization. We are

not persuaded that this moratorium on payments of principal and interest is sufficient reason to overcome the evidence indicating that payment of the note was not contemplated until many years after its issue. First, petitioner made no payments of principal or interest for at least 2 years after issuance of the note and prior to any negotiations for the SBA loan authorization, and for another year thereafter before any credit was actually extended. Second, it was Dr. D'Angelo who ultimately approved the moratorium on payments, in order to assist him in obtaining the SBA guaranteed financing to benefit his trade or business. Finally, it is apparent from the payment history of petitioner with respect to this note, beginning in 1971, that petitioner was at no time in the 16 years after issuance of the note inclined to or capable of liquidating the debt. Such circumstances are simply not consistent with the alleged short-term character of the note.

In sum, the facts demonstrate that Dr. D'Angelo, as holder of the $96,727.85 demand note, had a continuing interest in the rental property. We conclude that the note was a security, and that section 351(a) therefore applies to the transfers of rental property as contended by the respondent.[10]

## Issue II. Deductibility of Insurance Premiums

Dr. D'Angelo, doing business as Dade Dental Hospital, obtained a $75,000 loan authorization from the Small Business Administration in 1963, the money to be used to complete alterations to the rental property owned by petitioner, to retire installment loans of Dr. D'Angelo, and to provide operating expenses of the Dade Dental Hospital. Among the conditions of obtaining the loan authorization were that petitioner guarantee the loan and pledge certain corporate property as collateral, and that there be an assignment of insurance on the life of Dr.

---

[10]Petitioner advances one final argument—that sec. 1239 precludes application of sec. 351. It claims that the sale of the rental property under sec. 1239 allows for depreciation as provided in sec. 167, irrespective of sec. 351.

By its terms, sec. 1239 applies to a sale or exchange of depreciable property to certain controlled corporations *only if* gain is recognized to the transferor. Recognition or nonrecognition of gain or loss is a question that must be determined under sec. 351, before reaching sec. 1239 and the question of the character of gain recognized. See, e.g., *Easson v. Commissioner*, 33 T.C. 963 (1960), revd. on other grounds 294 F.2d 653 (9th Cir. 1961). We have found that sec. 351 applies to the transfers to petitioner, and that sec. 351(b) does not result in any recognizable gain. Therefore, sec. 1239 is not applicable on these facts.

D'Angelo in the amount of $75,000 to the M. & T. Bank. This latter requirement was satisfied, in part, by petitioner securing a new term insurance policy on the life of Dr. D'Angelo and assigning this policy as collateral to the Bank. The proceeds of this policy were payable to the Bank in the event of Dr. D'Angelo's death to satisfy any remaining balance on the $75,000 loan made to Dr. D'Angelo. During the fiscal year ending June 30, 1970, petitioner paid the premiums on this policy and claimed their deductibility as ordinary and necessary business expenses.

Section 264(a)(1) provides that no deduction may be taken for premiums paid on a life insurance policy covering the life of any officer or employee, or of any person financially interested in the trade or business of the taxpayer, when the taxpayer is directly or indirectly a beneficiary under the policy. Since Dr. D'Angelo was at all times relevant an officer of petitioner, deductibility of the premiums paid by petitioner turns upon whether petitioner was "directly or indirectly" a beneficiary under the policy within the meaning of section 264(a)(1). If this question is answered affirmatively, the premiums are not deductible, regardless of whether they would otherwise be deductible as a business expense. Sec. 1.264–1(a), Income Tax Regs. *Glassner v. Commissioner*, 43 T.C. 713, 715 (1965), affd. per curiam 360 F.2d 33 (3d Cir. 1966), cert. denied 385 U.S. 819 (1966).

This Court has previously held that the benefit requirement of section 264(a)(1) is satisfied where the insurance would ultimately satisfy an obligation of the taxpayer. *Rodney v. Commissioner*, 53 T.C. 287, 318–319 (1969); *Glassner v. Commissioner, supra*. Although the cited cases involved obligations (loans) incurred by the taxpayers themselves, and not as a guarantor as is petitioner, the benefits provided by the insurance policy to petitioner are not fairly distinguishable. Whether the taxpayer is the primary obligor or a guarantor, the insurance serves to provide a source of funds from which to satisfy the obligation in the event of the insured's death, relieving petitioner of any further liability under the guarantee, or if as is more likely, the obligation is paid in due course petitioner would be the owner of the policy unimpaired by any encumbrances.[11] We therefore find

---

[11]As noted in our findings, the assignment specifically reserved the right of petitioner, as assignor of the policy, to change the beneficiary as long as the change did not impair the rights of the assignee.

that petitioner has benefited within the meaning of section 264(a)(1) and that the amount of the premium paid for the term life insurance by petitioner is not deductible.

### Issue III. Vehicle Expenses

The final issue is whether petitioner is entitled to deductions for depreciation and the operational expenses for the two vehicles it owned during the taxable year. Respondent does not question the amounts of the claimed deductions, but maintains that the deductions are not allowable because the vehicles were used largely for the personal purposes of Dr. D'Angelo and his family.

Insofar as the two vehicles owned by petitioner were substantially used by Dr. D'Angelo for his personal use or for his own business unrelated to that of petitioner, the expenses associated with the vehicles are not in themselves ordinary and necessary business expenses of petitioner and the depreciation of the automobile is not with respect to property used in a trade or business of the petitioner. Deductions relating to uses of the vehicles other than for the petitioner's business are not allowable to the petitioner. *International Artists, Ltd. v. Commissioner*, 55 T.C. 94 (1970). Where there is both substantial business and substantial personal use, the expenses must be allocated and only those related to business use are deductible. See, e.g., *Sapp v. Commissioner*, 36 T.C. 852 (1961), affd. per curiam 309 F.2d 143 (5th Cir. 1962). The record clearly demonstrates that the vehicles in issue were used significantly for purposes unrelated to petitioner's business, including the personal business of Dr. D'Angelo. On the basis of the entire record, including the testimony of Dr. D'Angelo, we have determined that 65 percent of the aggregate expense claimed by petitioner for both vehicles for gas and oil and license fees is deductible; 30 percent of the depreciation and insurance claimed on the Chrysler is deductible; and that the insurance expense claimed for the Scout is deductible in its entirety.

*Decision will be entered under Rule 155.*