FREDERICK W. MILLER AND DORYCE H. MILLER, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Miller v. Commissioner
Docket Nos. 4026-77, 13422-78.
United States Tax Court
T.C. Memo 1982-629; 1982 Tax Ct. Memo LEXIS 115; 44 T.C.M. (CCH) 1528; T.C.M. (RIA) 82629; October 27, 1982. Frederick W. Miller, pro se. Alvin B. Sherron, for the respondent. FEATHERSTON
MEMORANDUM FINDINGS OF FACT AND OPINION FEATHERSTON, Judge: Respondent determined deficiencies in petitioners' Federal income taxes, as well as additions to tax under section 6653(a), [1] as follows: Docket No.
Year
Deficiency
Addition to Tax
13422-78
1970
$26,416.46
$1,320.82
1971
31,529.50
1972
24,008.36
1973
19,773.81
988.69
4026-77
1974
15,093.42
13422-78
1975
23,202.69
1,160.13
*116 After numerous concessions by both parties, the issues remaining for decision involve the deductibility, as bad debts under section 166, of certain advances of funds made by petitioners to Peter Bessell. Specifically, the questions presented are (1) whether these advances of funds gave rise to bona fide debts or rather were gifts; (2) if debts, whether they became worthless in 1973 and 1974; and (3) whether they constituted business bad debts, deductible in full, or nonbusiness bad debts, subject to the limitations of section 166(d). FINDINGS OF FACT At the time they filed their petitions in these consolidated cases, petitioners were legal residents of Oceanside, California. Petitioners filed their Federal income tax returns for 1970 through 1974, inclusive, with the Internal Revenue Service Center in Philadelphia, Pennsylvania, and filed their 1975 tax return with the Internal Revenue Service Center in Chamblee, Georgia. A certified public accountant by profession, petitioner Frederick W. Miller (petitioner) was employed for approximately 50 years by various international accounting firms and business corporations. Sometime after World War II, be began working for an *117 international chemical corporation and became treasurer and comptroller of one of its American subsidiaries, Rhodia, Inc. (Rhodia). After his 1972 retirement, petitioner continued to work intermittently for Rhodia as a consultant on a month-to-month basis until 1977. On his Federal income tax returns for 1973, 1974 and 1975, petitioner listed his principal business activity as "Business Consultant." He also listed income as follows: (figures are rounded for convenience). 1973
1974
1975
Wages [1]
$26,417
$22,400
Net Income from other
Business Consulting
Activities (without deducting
bad debts)
6,153
$7,425
8,630
Dividend Income (Including
Nontaxable Dividends)
25,170
25,849
26,686
Interest Income
(Taxable Only)
12,766
12,483
11,097
In 1973, petitioner's interest income was derived mainly from Federal bonds, certain *118 utility companies, and savings banks. He made no loans to any individuals other than Peter Bessell (Bessell) during 1971 through 1974. Petitioner first met Bessell in 1968, at the New York apartment of petitioner's daughter, Diane Kelly, and her then husband. Bessell, at that time was a member of the British Parliament, and was an investment broker working in a family-run business in London. The basic activity of this business, in Bessell's words, "was finding funds for major corporations who wished to borrow at the lowest market rate for real estate development corporations, hotel corporations, and other major international companies." In 1970, Bessell did not seek reelection to the British Parliament and extended his business activities in the United States. He intended to form a New York corporation, Peter Bessell, Inc. (the New York company or PBI), as a subsidiary of his British company, Peter Bessell, Limited, located in London and Plymouth, England. Bessell invited petitioner to invest in this new enterprise. In a letter to petitioner, dated February 23, 1971, Bessell set forth various formalities and projections for the New York company, PBI, and estimated that he *119 required approximately $200,000 in "loan capital" during the first 2 years of operation; this sum was expected mostly to cover establishing the office as well as travel, promotion, salaries and other expenses. Anticipating that income would not exceed $50,000 in the first 18 months, [2] Bessell proposed to "arrange for my British Company, Peter Bessell Ltd. to lend, or invest, $50,000 in the New York Corporation and to borrow the remaining $150,000." In addition to suggesting that petitioner furnish the needed "loan capital," Bessell, in a letter dated February 23, 1971, referred to petitioner's possible future employment with PBI as follows: I have in mind that you might be willing to give me your occasional part time services [as an accountant] for the remainder of this year on a fee and expenses basis to be agreed and your full time services as from January 1, 1972 if this fits in with your contract with your present firm. It was my understanding, particularly during our discussion on *120 Sunday afternoon, that while you would be willing to provide a capital sum of the sort I require you would wish it to be tied to an Employment contract. Needless to say this would be most satisfactory to me. Your experience of working with the subsidiary of a multi-national Corporation is exactly what is required for the success of my new venture. In a letter dated February 28, 1971, petitioner wrote: I understand you would like to employ me as a consultant accountant to this corporation [PBI] for a period of seven years starting January 1, 1972, on the condition that I give you a series of loans totalling $150,000 to help in establishing the corporation. The letter further states that petitioner would agree to lend that sum, at 9 percent annual interest, "provided you personally give me a seven year employment contract" on the following terms: Year
Salary
1972
$5,000 for part-time services
1973, 1974
$25,000
1975-1978
$30,000
To Bessell's suggestion that he consider taking stock in PBI in repayment for part of the loan, petitioner wrote that he had "no interest." The substance of these letters was embodied in a contract dated March 6, 1971 (the *121 March 1971 agreement) whereby petitioner agreed to lend Bessell the sum of $150,000, in installments as Bessell indicated he needed the funds, between March 6, 1971 and December 31, 1972. The term of the loan was 5 years from the date of the first installment payment, and bore interest, payable annually, at a rate of 9 percent. In "consideration" of the loan, the agreement states that Bessell "will employ Miller as a Consultant Accountant for a period of seven (7) years" at the salaries suggested in petitioner's letter of February 28, quoted above. Bessell also agreed to provide petitioner with a car during the employment period. Petitioner loaned $150,000 to Bessell in installments, between March 1971 and March 1972. As a part of these agreed loans, petitioner transferred $15,000 in three separate checks in November and December 1971. Two of these checks were written to the order of Diane Kelly, petitioner's daughter, to reimburse her for some sums she had transferred, on petitioner's behalf and in connection with the agreement, to Bessell; the third check was written to Bessell. Petitioner never received any salary, the use of a car, or any interest or repayment of principal *122 on these loans. Petitioner made no credit check of Bessell and obtained no detailed information concerning the extent of Bessell's personal assets before agreeing to make this initial $150,000 or any subsequent loans. He kept no books of accounts in connection with these loans to Bessell but did retain copies of the agreements, cancelled checks and promissory notes. He believed that Bessell was solvent, because petitioner knew that, in general, under British electoral law a person who has been adjudged bankrupt [3] may not seek election to Parliament. Petitioner also examined certain certified statements from Bessell's London accountants which showed that Bessell's business was profitable. Due in part to international credit restrictions, *123 Bessell's New York company did not progress as forecast. In a letter of May 23, 1972, petitioner agreed to Bessell's request of an additional loan in the amount of $25,000 to permit continuing negotiations with a Zurich based investment group. Petitioner specified that this additional loan was not to be part of the original loan/employment agreement of March 1971, but rather he required a demand note from Bessell with interest at 10 percent payable annually. To advance these funds, petitioner wrote a check for $25,000 on May 26, 1972. No payment of interest or principal was made on this loan. Near the end of June or beginning of July 1972, Bessell informed petitioner of an unexpected business opportunity involving the redevelopment of a number of properties located in a small town in Westchester County, north of New York City. The town, Bronxville, was founded around the turn of the Century by the Lawrence family, who retained large parts of it. In 1972, William V. Lawrence (Lawrence), the "head" of the Lawrence family, wished to redevelop some of the older properties without jeopardizing the character of the town. Lawrence, distrustful of New York brokers, wanted Bessell *124 to obtain European investment money and to assist him in the redevelopment. In a letter to petitioner dated August 22, 1972, Bessell described the project as follows: This is by far the most exciting project I have been associated with at any time in my business career and it appears as foolproof as any I have seen. The income figures for most of the properties are good, the profits are satisfactory and on the basis of the purchase prices we have tentatively agreed would remain so even without redevelopment. After redevelopment, well, the sky's the limit.' I will keep you fully informed of all developments as things go forward. I think you will agree that at last it seems my luck has turned. Petitioner became enthusiastic about the project and offered aid, "financial or otherwise." Bessell prepared and submitted to petitioner copies of two memoranda dated August 9, 1972, and October 17, 1972, which set forth numerous details of the Bronxville project. These memoranda included plans for redevelopment and management of the properties, descriptions and valuations of the properties, the proposed corporate structure for a corporation to be formed to own the properties, existing *125 and projected income and profits, and staffing requirements. Also included was a copy of an agreement dated October 3, 1972, between Lawrence Investing Company, Inc. and Bessell, whereby Bessell obtained an option to purchase the Bronxville properties within a specific time for a purchase price of $7,500,000. In a memorandum dated October 17, 1972, Bessell discussed petitioner's involvement in the Bronxville project. In addition to mentioning certain employment arrangements, Bessell noted that he and petitioner agreed to an additional $50,000 loan, and that the $25,000 loaned in May would become part of a second Loan-Employment agreement. The memorandum states that, if Bessell needed more loans later, "there will be no difficulty" in Bessell's borrowing against the assets of the new corporation, or borrowing personally against the value of his shares of stock in the new corporation. In accordance with this memorandum, petitioner and Bessell entered into a second loan/employment agreement, dated October 31, 1972 (th October 1972 agreement). Petitioner agreed to loan the additional $50,000 for 5 years at interest of 10 percent per annum. Bessell's demand note evidencing the *126 $25,000 loan of May 26, 1972, was cancelled and that $25,000 was added to the new $50,000 loan so that the loan under this October 1972 loan/employment agreement totaled $75,000. It was expected that repayment of these loans would derive from profits of the Bronxville business project. Like the first loan/employment agreement, this agreement provided that "in consideration" of the loans, Bessell agreed to employ petitioner as a consultant accountant; the employment was to start April 1, 1973, and run for 5 years at an annual salary of $25,000 (in addition to the $25,000 salary of the March 1971 agreement). It was further agreed on November 9, 1972, that Bessell should pay petitioner an additional $75,000 per annum for his accounting services so that petitioner could employ and pay for a secretary, a bookkeeper, and possibly a junior accountant. In addition to these two formal agreements for loans of $150,000 and $75,000, respectively, petitioner orally agreed to make loans on a short-term basis as Bessell required. Petitioner thus made five loans in 1973 for which Bessell gave promissory notes; these loans totaled $115,500 [4] and bore annual interest of 10 or 12 percent. It *127 was understood that Bessell would repay the loans as soon as the Bronxville negotiations were completed. No payments of interest or principal were made on any of petitioner's loans. The loans made by petitioner to Bessell from 1971 through 1973 are categorized as follows: 1. Loans made pursuant to Loan/Employment Agreement of March 1971 Date
Amount
March 1971
$ 38,000
November-December 1971 [1]
15,000
February 1972
35,000
March 1972
2,000
March 1972
60,000
$150,000
2. Loans made pursuant to Loan/Employment Agreement of October 1972 Date
Amount
May 1972 [1]
$25,000
November 1972
15,000
February 1973
35,000
$75,000
*128 3. Additional short-term loans, evidenced by promissory notes, pursuant to oral agreement Date
Amount
May 1973
$ 40,000
June 1973
50,000
September-October 1973 [1]
23,000
December 1973
2,500
$115,500
In addition to petitioner's loans, Bessell also obtained loans in 1973 for the Bronxville project from both the Chase Manhattan Bank in New York and the National Westminster Bank in Plymouth, England. These loans totaled approximately $30,000 to $50,000 from each bank and were unsecured. Guy Richards, one of the original investors in PBI, advanced about $20,000 and another business associate also advanced money. In August 1973, Bessell brought into the Bronxville project Capital and Countries, Limited, and Grovesnor Estates, large British international investment and development companies. Because Lawrence insisted that investment money come mainly from European sources, long, time-consuming negotiations with the Bank of England were necessitated *129 in order to obtain the requisite exchange control permits; without these permits, British investors could not put money into the project. Negotiations for the financing and development of the project became increasingly prolonged. By mid-December 1973, Bessell had exhausted all of his own financial resources and, believing that he could not borrow additional necessary sums, he concluded that he faced bankruptcy. Faced with this prospect, Bessell fled from New York, leaving no forwarding address; in effect, he disappeared. He went first to Mexico but later returned to the United States and resided in California. Upon his return to California, petitioner's daughter, Diane Kelly, joined him and supported him. When Bessell's divorce became final in 1978, Bessell and petitioner's daughter were married. Following Bessell's disappearance, his New York company, PBI, ceased business in January 1974, and his London company was declared bankrupt in July 1974. The owners of the Bronxville properties sold them in or around mid-1974 to the international development firms that Bessell had brought in, on essentially the same terms Bessell had proposed.
After discovering Bessell's disappearance, *130 petitioner consulted with the Chase Manhattan Bank, the National Westminster Bank, and London attorneys. He concluded that Bessell's only asset was the equity in his house, amounting to approximately $15,000 after discharge of the mortgage. The claims of preferred creditors in England exceeded that amount. Believing it futile, petitioner never instituted a suit to attempt collection on his loans. After consultations with the British attorneys in August 1974, petitioner effectively arranged a settlement with Bessell's other creditors and paid these creditors approximately $40,000 to $46,000. Following substantial completion of the settlement in November 1975, Bessell resurfaced. Sometime thereafter he began to contact former business associates in an attempt to reestablish some degree of business activity. These efforts were thwarted, however, after January 1976, when he became enmeshed in a political scandal in Britain. This scandal involved Jeremy Thorpe, a leader of the political party to which Bessell had belonged. Because of Bessell's involvement with Thorpe's affairs, Bessell received significant attention by the news media. The media brought to light Bessell's disappearance *131 and business failures, which had previously attracted no notice.This attention continued through Thorpe's trial for conspiracy to murder, at which Bessell was the chief prosecution witness, and subsided only after Thorpe's acquittal in June 1979. On Schedule C of his 1973 Federal income tax return, petitioner deducted $115,500 as a business bad debt; this sum equals the loans made in 1973 as evidenced in promissory notes. Similarly, on Schedule C of his 1974 tax return, petitioner deducted $225,000 as a business bad debt; this sum corresponds to the loans made between March 1971 and February 1973 pursuant to the two loan/employment agreements ($150,000 from the March 1971 agreement and $75,000 from the October 1972 agreement). [5]
*132 In the notice of deficiency covering 1973, respondent determined "that the series of loans which you made to Mr. Peter Bessell over a 4-year period, allegedly to help establish Mr. Bessell in an investment brokerage business, were not bona fide loans for tax purposes and, alternatively, if said loans were bona fide, they did not become uncollectible and worthless in 1973 * * * to the extent of * * * $115,500 * * * as you have claimed. Furthermore, if said loans were uncollectible as claimed, they constitute nonbusiness bad debts subject to the short-term capital loss limitations of Section 166(d) * * *." In the notice of deficiency for 1974, respondent determined that the bad debt of $225,000 was not allowable "since it has not been established that a bad debt existed. Alternatively, if a bad debt loss can be established, then it has not been shown that it was a business bad debt rather than a nonbusiness bad debt." OPINION From 1971 to 1973, petitioner made a series of advances of funds to Peter Bessell, an international investment broker, in connection with a business that Bessell was starting in New York. Under two "loan/employment" agreements of March 1971 and October *133 1972, respectively, petitioner advanced a total of $225,000, and in 1973, petitioner advanced $115,500 to Bessell, as evidenced by Bessell's personal promissory notes. Petitioner deducted as business bad debts under section 166, [6] $115,500 in 1973 and $225,000 in 1974; respondent denied both deductions. *134 Respondent makes three alternative arguments supporting these determinations: (1) The advancements were not bona fide loans within the meaning of section 166(a) but instead were gifts; (2) if the advancements were loans, they did not become worthless during the years in question; and (3) if they did become worthless, they were nonbusiness rather than business bad debts and hence subject to short-term capital loss status under section 166(d). Petitioner argues that these advancements of funds constituted bona fide loans, which became worthless sometime in late 1973 or in 1974, and that they were incurred in the pursuit of his "business" as a consultant accountant and a lender of money. We hold that petitioner is entitled to a nonbusiness bad debt deduction in 1974 for the loans to Bessell. 1. Bona Fide Debt v. Gift.
A deduction for a bad debt is allowable only if, among other things, the advancements of funds in question create bona fide debts, as opposed to contributions to capital or gifts. A bona fide debt is one "which arises from a debtor-creditor relationship based *135 upon a valid and enforceable obligation to pay a fixed or determinable sum of money." Section 1.166-1(c), Income Tax Regs. Whether a bona fide debtor-creditor relationship exists is a question of fact to be resolved in the light of all the pertinent facts. Fisher v. Commissioner,54 T.C. 905, 909 (1970). Respondent contends that the advancements of funds in 1973 ($35,000 under the October 1972 loan/employment agreement plus $115,500 evidenced by promissory notes) do not constitute bona fide debts because, he asserts, petitioner had no reasonable expectation of repayment. Respondent implicitly concedes that the other sums transferred under the two loan/employment agreements (totaling $190,000) qualify as bona fide debts. In deciding whether a bona fide debt exists as to the 1973 advances of funds, the intention of the parties with respect to repayment is critical. Berthold v. Commissioner,404 F.2d 119, 122 (6th Cir. 1968); Fidelity Commercial Co. v. Commissioner,55 T.C. 483, 488 (1970), affd. per order (4th *136 Cir., Sept. 1, 1971); Fisher v. Commissioner,54 T.C. 905, 910 (1970). Also significant are objective indicia, such as a written agreement or note with provisions for interest and a time and method of repayment. Fidelity Commercial Co. v. Commissioner,supra at 488; Rude v. Commissioner,48 T.C. 165, 172 (1967); cf. United States v. Henderson,375 F.2d 36, 40 (5th Cir. 1967). However, if the facts and circumstances "belie any genuine intent to repay these sums" at the dates fixed in the notes, no bona fide debt exists. United States v. Henderson,supra at 40. We think that Bessell and petitioner intended for the 1973 advancements to be repaid, and that this intention was evidenced by the interest bearing promissory notes, the loan/employment contract, and the economic prospects of the Bronxville project. Petitioner exacted and Bessell gave written agreements documenting the liability, and the evidence shows that repayment was expected. Both petitioner and Bessell were enthusiastic about the Bronxville project, which appeared to be a unique and potentially highly lucrative venture. *137 Petitioner was informed of the plans for the project by Bessell's memoranda and reports.Other investors--two banks and two individuals--loaned money for the Bronxville project, and none of these loans appears to have been secured. We do not think petitioner's loans are by nature different from the loans of other lenders. The Bronxville project's failure was attributable to unforeseen delays in negotiations with foreign lenders which pushed Bessell to panicked flight, and then to loss of the project. In every bad debt situation, there is misjudgment on someone's part. In this case, the project appeared well-conceived; Bessell thought it "foolproof." After Bessell's disappearance it was bought by the development companies on essentially the same terms as Bessell had proposed. In the unique facts of this case, we think petitioner reasonably expected repayment of his loans, that Bessell fully expected to repay them, and that petitioner merely misjudged the time required to obtain investment money from England. Absent the advent of the Bronxville project in 1973, respondent's argument that there was no genuine expectation of repayment would carry more weight. In the light of their *138 evaluation of the project, we think both petitioner and Bessell expected the debt to be repaid. We hold, therefore, that a valid debt existed as to the advances made in 1973. We recognize that petitioner did not inquire as to Bessell's personal financial situation, but was "only concerned" with Bessell's "business career and companies." This treatment of Bessell's creditworthiness, however, accords with our conclusion that petitioner regarded the advances to Bessell as business loans rather than personal gifts and was convinced the Bronxville project would succeed. That there was risk that Bessell's business would fail or that Bessell would go bankrupt is not determinative. Any unsecured debt involves risk. Where, as here, the parties intended the transactions to be loans, and the repayment prospects appeared to be genuine in the light of economic realities to responsible investors, we cannot conclude that the debts were worthless when created. [7]
*139 Respondent argues that petitioner advanced large sums of money to Bessell primarily because of Bessell's friendship with, and later marriage to, petitioner's daughter. He suggests that we view the loans with suspicion because of this family connection. See Mercil v. Commissioner,24 T.C. 1150 (1955). It is clear that Bessell and petitioner's daughter were friends in 1973 and that they eventually were married.Moreover, two of the checks pursuant to the March 1971 agreement were written to the order of Diane Kelly, to reimburse her for moneys she had advanced, on her father's behalf, to Bessell. We note, too, that Diane Kelly joined Bessell in 1974 in California when he returned from Mexico. We do not think, however, that the friendship between Bessell and Kelly prompted petitioner to make loans he would otherwise not have made, or that these loans were "gifts," made out of "detached and disinterested generosity." Commissioner v. Duberstein,363 U.S. 278, 285 (1960); Commissioner v. LoBue,351 U.S. 243, 246 (1956). Petitioner was a highly successful investor, and the Bronxville project appeared to him to be a noteworthy opportunity. *140 Moreover, in 1973, no family connection existed, and in any event, familial relationships need not necessarily negate the existence of a loan. [8] After evaluating all the facts, we conclude that the advancements in 1973 constituted valid debts. 2. The Year of Worthlessness
In view of our finding that a valid debt existed, the next issue is the taxable year in which it became wholly worthless, section 166(a)(1); a debt becomes worthless in the year in which identifiable events clearly mark the futility of any hope of recovery. James A. Messer Co. v. Commissioner,57 T.C. 848, 861 (1972). Worthlessness, like the existence of a debt, is a question of fact, in which "all pertinent evidence" is to be considered. Section 1.166-2(a), Income Tax Regs:, Perry v. Commissioner,22 T.C. 968, 973 (1954). We think it quite clear that all of the loans petitioner made to Bessell became worthless in 1974. During that year, after Bessell's disappearance, petitioner *141 conferred with Bessell's attorneys in London, as well as with the National Westminster Bank and the Chase Manhattan Bank, on Bessell's financial situation. He established that Bessell's assets would not permit repayment of his unsecured debts. Also, bankruptcy proceedings commenced in England. We think these identifiable events show that the debts to Bessell became worthless in 1974, and that petitioner made reasonable efforts to ascertain whether collection was possible. See Lee Mercantile Co. v. Commissioner,79 F.2d 391, 393 (10th Cir. 1935). We must sustain respondent's denial of the bad debt deduction for 1973 on this ground; [9] the deduction is allowable in 1974. 3. Business v. Nonbusiness Bad Debt
Having concluded that petitioner is entitled to a bad debt deduction in 1974, the question remains whether petitioner's loss was a business *142 bad debt, deductible in full, or a nonbusiness bad debt, deductible only as a short-term capital loss. Section 166(a)(1) and (d). A debt acquired by an individual taxpayer will be classified as a nonbusiness bad debt unless the taxpayer establishes that he was engaged in a trade or business to which the loss on the debt was proximately related. Section 1.166-5(b), Income Tax Regs:, Putoma Corp. v. Commissioner,66 T.C. 652, 673 (1976), affd. on other issues 601 F.2d 734 (5th Cir. 1979). This means that petitioner must show that his "dominant" motive in lending the money to Bessell was to promote or advance his work as a consultant-accountant; "significant" motivation is not sufficient. United States v. Generes,405 U.S. 93, 103 (1972). We are not convinced that petitioner's dominant motive in making the loans was to advance his business as a consultant and accountant. Petitioner testified that he expected to have to leave Rhodia in 1972 after his 68th birthday. Wanting to remain employed, he decided to "set *143 up" as a consultant accountant, and believed that his "opportunities for employment would be considerably improved" if he offered to lend money to the firms that considered engaging him. The two loan/employment agreements pursuant to which petitioner lent the $225,000 he deducted in 1974, stated that "in consideration" of the loan, Bessell would employ petitioner as a consultant accountant. Despite the use of the word "consideration" in those agreements, we are not convinced that petitioner made the loan with the dominant motivation of benefitting his "trade or business" of being a consultant accountant. Compare Trent v. Commissioner,291 F.2d 669 (2d. Cir. 1961). In the first document mentioning petitioner's future employment on any of Bessell's projects, Bessell wrote: I have in mind that you might be willing to give me your * * * services [as an accountant in the future]. * * * It was my understanding, particularly during our discussion on Sunday afternoon, that while you would be willing to provide a capital sum of the sort I require you would wish it to be tied to an Employment contract. Needless to say this would be most satisfactory to me. *144 Your experience of working with the subsiduary of a multi-national Corporation is exactly what is required for the success of my new venture. [Emphasis added.] We glean from this letter that Bessell proposed to employ petitioner, and petitioner was the one who insisted that the employment and loan be linked in the employment/loan agreements. Bessell obviously respected petitioner's judgment and expertise, and we are not convinced that Bessell would not have employed him without the loans. See Putoma Corp. v. Commissioner,supra at 674. As reflected by the summary of petitioner's income sources set forth in our findings, petitioner derived the major part of his income from investments. Taking into account petitioner's age at the time the loans were made, we think it unlikely he would make loans of such magnitude predominantly to build his consulting and accounting business. Moreover, we infer from petitioner's silence on the matter that petitioner was able to obtain employment as a consultant accountant with Merieux Institute, Inc., in 1975 without making any loans. His other consulting activities, which netted petitioner approximately $6,000-$8,000 *145 a year, as reflected in our findings, apparently necessitated no loans. We think petitioner's main reasons for making the loans were to earn interest income and to accommodate Bessell. Petitioner also contends that he was in the trade or business of lending money and that his loans to Bessell were proximately related to this trade or business. While it is clear that a taxpayer may have more than one trade or business at one time, Paul v. Commissioner.18 T.C. 601, 603 (1952), revd. on other grounds 206 F.2d. 763 (3d Cir. 1953); Good v. Commissioner,16 T.C. 906 (1951), petitioner has failed to show that his pattern of loaning money differed from that of an ordinary investor. See Higgins v. Commissioner,312 U.S. 212 (1941). The only evidence of record, in addition to petitioner's statements that he loaned money continuously, shows that petitioner received about $12,000 a year in interest income. Most of that income, however, was derived from bonds and savings accounts. He testified that he made no other loans to individuals. *146 These "loans" he made were typical investments, which, along with petitioner's approximately $26,000 in dividend income, constituted the annual return on his investment portfolio. We hold, therefore, that petitioner is entitled to a nonbusiness bad debt deduction for 1974. Decision will be entered under Rule 155.
Footnotes
1. All section references are to the Internal Revenue Code of 1954, as in effect during the tax years in issue, unless otherwise noted.↩
1. According to forms attached to petitioner's returns, the 1973 wages were paid by Rhodia, and the $22,400 in 1975 by Merieux Institute, Inc. This latter sum appears to have been included in the $37,400 reported as gross receipts from "Business Consultant" activities as reported in Schedule C of his 1975 return.↩
2. In a subsequent letter of Feb. 26, 1971, Bessell elaborated on the profits projections, anticipating pre-tax profits of $0 in 1971 and 1972, $50,000 in 1973 and $150,000 in 1974.↩
3. A person who has been adjudged bankrupt is disqualified from being elected to or sitting or voting in the House of Commons. Bankruptcy Act 1883, s. 32. This disqualification is limited to a period of 5 years from the date of a discharge. 34 Halsbury's Laws of England, "Parliament" par. 1105 (4th ed. 1980); Erskine May's Treatise on The Law, Privileges, Proceedings and Usages of Parliament 40-41 (D. Lidderdale ed. 19th ed. 1976).↩
4. The total amount advanced under promissory notes is stipulated as $115,000. The 1973 return, the notice of deficiency, and the sum of the notes in evidence, see chart following, all establish this amount as $115,500.↩
1. It is stipulated that a loan of $15,000 was made in Nov. 1971, but it appears from documents that petitioner wrote a check in Nov. of $7,000 (payable to Diane Kelly) and in Dec. checks of $5,000 (also payable to Diane Kelly) and $3,000 (payable to Bessell).↩
1. This outstanding loan was included in the Oct. 1972 agreement and the demand note on it was cancelled.↩
1. It is stipulated that a loan of $23,000 was made in Sept. 1973, although the sum was evidenced by two separate promissory notes, one for $19,000 written in Sept. and one for $4,000 written in Oct.↩
5. On his 1975 Federal income tax return, petitioner deducted a bad debt in the amount of $39,999.08, which apparently represents part of the amount paid in the creditors' settlement. Petitioner explained this deduction in his petition (in dkt. No. 13422-78) as follows: The petitioner, * * * in the course of an abortive attempt to reestablish the borrower [Bessell] in business and recover the loans, at least in part, made a creditors' settlement in 1975 with the borrower's other creditors. The payments amounted to $39,999.08 and the borrower was, and still is unable to repay these settlement payments. Petitioner has conceded that respondent correctly denied this deduction in 1975.↩
6. SEC. 166. BAD DEBTS. (a) General Rule.-- (1) Wholly worthless debts.--There shall be allowed as a deduction any debt which becomes worthless within the taxable year. (d) Nonbusiness Debts.-- (1) General rule.--In the case of a taxpayer other than a corporation-- (A) subsections (a) and (c) shall not apply to any nonbusiness debt; and (B) where any nonbusiness debt becomes worthless within the taxable year, the loss resulting therefrom shall be considered a loss from the sale or exchange, during the taxable year, of a capital asset held for not more than 6 months. (2) Nonbusiness debt defined.--For purposes of paragraph (1), the term "nonbusiness debt" means a debt other than-- (A) a debt created or acquired (as the case may be) in connection with a trade or business of the taxpayer; or (B) a debt the loss from the worthlessness of which is incurred in the taxpayer's trade or business.↩
7. Respondent asserts that repayments was contingent upon the success and profits of the business, thus attempting to portray the advances as obligations subject to a contingency that never occurred, and hence, as not being debts at all. See Zimmerman v. United States,318 F.2d 611 (9th Cir. 1963).We disagree. The evidence does not show that the legal obligation to repay was conditional; the uncertainty in this case relates to whether Bessell actually would fulfill his unconditional obligation to repay. Petitioner may indeed have expected the notes to be paid from earnings, or from the proceeds of other loans from other lenders, but "the payment of indebtedness usually depends to a large extent upon the success of the obligor." Nye v. Commissioner,50 T.C. 203, 217 (1968); see American Processing & Sales Co. v. United States178 Ct. Cl. 353, 371 F.2d 842, 856-857↩ (1967).
8. White v. Commissioner,T.C. Memo. 1971-13↩.
9. Petitioner explained that he deducted the loans made, pursuant to promissory notes, in 1973 because he discovered Bessell's disappearance before he filed his 1973 income tax return. Clearly, however, the facts showing worthlessness were established in 1974 and this is the proper and only year for deduction.↩